NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12105


COMMONWEALTH  vs.  McGREGORY MENEUS.



Middlesex.      September 8, 2016. - January 11, 2017.

Present:  Gants, C.J., Botsford, Lenk, Hines, Gaziano, Lowy, &
Budd, JJ.


Firearms.  Constitutional Law, Investigatory stop, Stop and
    frisk, Reasonable suspicion, Search and seizure.  Search
    and Seizure, Threshold police inquiry, Protective frisk,
    Reasonable suspicion.  Practice, Criminal, Motion to
    suppress.




Complaint received and sworn to in the Cambridge Division
of the District Court Department on June 30, 2006.

A pretrial motion to suppress evidence was heard by James
L. LaMothe, Jr., J., and a motion for reconsideration was
considered by him; and the case was heard by Michele B. Hogan,
J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.


David Gerson for the defendant.
Randall F. Maas, Assistant District Attorney, for the
Commonwealth.

HINES, J.  After a jury-waived trial in the Cambridge District Court, the defendant was convicted of various firearms charges.  The firearm was discovered after the defendant and a group of young black males were stopped by Cambridge police officers to investigate a report of shots fired at a vehicle. The defendant filed a motion to suppress the firearm, claiming that the police lacked reasonable suspicion for the stop.  The motion judge denied the motion, as well as a motion for reconsideration thereof filed in light of our decisions in Commonwealth v. Martin, 457 Mass. 14 (2010), and Commonwealth v. Narcisse, 457 Mass. 1 (2010).[1]  The defendant appealed from his convictions and the Appeals Court affirmed in an unpublished memorandum and order issued pursuant to its rule 1:28.  We allowed the defendant's application for further appellate review.  We conclude that the police lacked reasonable suspicion for the stop and that the denial of the motion to suppress was error.  Therefore, we vacate the conviction and remand for a new trial.

---

[1] The defendant argued that the judge's decision on the motion to suppress conflicted with our holdings in Commonwealth v. Martin, 457 Mass. 14, 19-20 (2010), and Commonwealth v. Narcisse, 457 Mass. 1, 9 (2010), that police officers may not progress from a consensual encounter to a protective frisk without reasonable suspicion that the individual is engaged in criminal activity and is armed and dangerous. The judge denied the motion.

Background.  We summarize the facts as found by the motion judge, supplemented by uncontroverted evidence drawn from the record of the suppression hearing and evidence that was implicitly credited by the judge.[2]  Commonwealth v. Melo, 472 Mass. 278, 286 (2015).

In the late evening hours of April 29, 2006, Debra Santos reported to police that a gunshot struck her vehicle as she was driving on Windsor Street in Cambridge.  At approximately 10:50 P.M., Cambridge police officers Janie Munro and David Porter met Santos at the intersection of Windsor and Washington Streets, near the location where the shots allegedly were fired.  Santos told the police that she heard a loud noise that she believed was a gunshot and that immediately thereafter she saw a group of young black males run into the courtyard of the Washington Elms housing complex.  She did not indicate to the police that this group was involved in the shooting at her vehicle, and she provided no additional descriptive information about the individuals she had seen running into the courtyard.

While speaking to Santos, Officer Munro observed a group of young black males who were standing on a sidewalk near the

---

[2] While assembling the record for the appeal, appellate counsel learned that the recording of the January 16, 2009, proceeding on the motion to suppress, consisting of Officer Janie Munro's testimony on direct examination, could not be located.  After a hearing on the defendant's motion to perfect the record, the motion judge issued written findings as to the content of Officer Munro's direct testimony.

Washington Street entrance to the housing complex. The group was "[l]iterally right around the corner" from where Santos had stopped after hearing what she believed to be gunshots. Officer Munro's attention was drawn to the group by one of the males who "st[u]ck his head outside [of the courtyard] and st[u]ck his head back inside." The officers drove their cruiser to where the group was standing and approached the group on foot. The defendant, one of five or six young black males in the group, was wearing a black bomber jacket with a visibly distinctive orange lining. The officers asked if anyone had information about gunshots being fired in the area. They denied any knowledge of a shooting.

After questioning the group, the officers requested permission to pat frisk them for "officer safety." At the time of this request, the police officers had had no prior interaction with any of the young men in the group and no information that anyone previously had been involved in criminal activity. The judge made no finding that the defendant or anyone else in the group engaged in suspicious or potentially threatening conduct toward the police at any time during the encounter. Up until the request to pat frisk the group, the tone had been conversational. But thereafter, the young men expressed their displeasure with the stop and with being asked to submit to a patfrisk. Some of them submitted to the

officers' request but they were "unhappy" about it.  The judge made no finding that the defendant consented to the patfrisk.

The defendant became argumentative when the police began pat frisking some members of the group, and he attempted to terminate the encounter by walking away.  As the defendant "started moving backwards" away from the group, one of the officers started pursuing him.  The defendant turned and began running away from the area.  The officers yelled, "Cambridge police, stop," and pursued the defendant into the housing complex.  The defendant ignored the order to stop and continued running.  During the chase, the defendant passed Santos, who grabbed his clothing, slowing his flight from the area.  After a brief chase, the police eventually caught up to the defendant on Windsor Street where he was "assisted to the ground" by Officer Porter.  As the defendant was being brought to his feet, the officers discovered a firearm that had been underneath his body. Although Santos remained on the scene while the police investigated the group, the police did not ask if she could identify anyone as being in the group of young men she observed running into the courtyard after hearing the gunshots.

The judge explicitly credited Officer Munro's testimony that, at the time the police initiated the pursuit of the defendant into the courtyard, she had "no information" that the defendant was a suspect in the shots fired call or any other

crime. Consistent with this finding, Officer Porter acknowledged that, at the time of the request to pat frisk the group, he had no information implicating the defendant or any of the other young black males in criminal activity. Officer Porter agreed that at the time of the pursuit, the defendant was not a suspect in a crime and that he was merely "a person in question."

Discussion. 1. Standard of review. "In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error and leave to the judge the responsibility of determining the weight and credibility to be given . . . testimony presented at the motion hearing." Commonwealth v. Wilson, 441 Mass. 390, 393 (2004). However, "[w]e review independently the application of constitutional principles to the facts found." Id. The Commonwealth bears the burden of demonstrating that the actions of the police officers were within constitutional limits. Commonwealth v. DePeiza, 449 Mass. 367, 369 (2007).

The analysis of the constitutional propriety of the police officers' conduct focuses on two questions: (1) whether and when the defendant was seized in a constitutional sense; and (2) whether the facts known to the police at the time of the seizure establish reasonable suspicion that the defendant had committed, was committing, or was about to commit a crime. Commonwealth v.

Depina, 456 Mass. 238, 241-242 (2010). The defendant argues that the police effected a seizure of his person when they manifested their intent to pat frisk the group and, at that moment, the police lacked reasonable suspicion of criminal activity. The Commonwealth counters that the seizure occurred when the police commanded the defendant to stop and, at that point, the information known to the police justified their inquiry.

2. The seizure. A person is seized under art. 14 of the Massachusetts Declaration of Rights "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Commonwealth v. Barros, 435 Mass. 171, 173-174, (2001), quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980). The judge's ruling on the motion to suppress did not specifically identify the moment at which the defendant was seized. We are persuaded, however, that a seizure for constitutional purposes occurred when one of the police officers advanced toward the defendant as he turned to leave the area in an apparent attempt to avoid an imminent patfrisk.

As the judge found, the young men in the group initially were cooperative with the police in responding to the inquiry about the alleged shooting. Their willingness to cooperate changed, however, when the police requested permission to pat

frisk the group "for officer safety." Some members of the group eventually acquiesced to the patfrisk request, albeit reluctantly. The defendant, however, remained defiant and "argumentative" during the encounter, never manifesting any intent to submit to the patfrisk. Observing that the police were intent on pat frisking the group, the defendant attempted to leave the scene. The police officer's response, pursuing the defendant as he backed away, communicated unequivocally that refusing to submit to the "request" was not an option. That act added a "compulsory dimension" to the encounter, transforming it from consensual to obligatory. See Barros, 435 Mass. at 174. Thus, where the police officer's conduct impeded the defendant's freedom of movement, he was seized for constitutional purposes, as "a reasonable person would have believed that he was not free to leave" at that point in the encounter. Id. at 175-176.

3. Reasonable suspicion. Once a seizure has occurred, the issue for the court is "whether the stop was based on an officer's reasonable suspicion that the person was committing, had committed, or was about to commit a crime." Commonwealth v. Martin, 467 Mass. 291, 303 (2014). "That suspicion must be grounded in 'specific, articulable facts and reasonable inferences [drawn] therefrom' rather than on a 'hunch.'" DePeiza, 449 Mass. at 371, quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004). Reasonable suspicion is measured by an

objective standard, Commonwealth v. Mercado, 422 Mass. 367, 369 (1996) and the totality of the facts on which the seizure is based must establish "an individualized suspicion that the person seized by the police is the perpetrator" of the crime under investigation.  Commonwealth v. Warren, 475 Mass. 530, 534 (2016).

The motion judge ruled that police had reasonable suspicion for the seizure based on a combination of factors:  (1) the defendant was part of a group of black males matching the description provided to police by the victim; (2) the stop occurred in a "high crime" area; (3) the purpose of the stop was to investigate a report of shots fired, a crime posing an imminent threat to public safety; (4) the defendant and his companions were in close geographical and temporal proximity to the alleged crime at the time of the stop; (5) the defendant fled from the scene; and (6) the officers' safety justified the patfrisk.  We review the judge's findings as a whole, bearing in mind that "a combination of factors that are each innocent of themselves may, when taken together, amount to the requisite reasonable belief" that a person has, is, or will commit a particular crime.  Commonwealth v. Feyenord, 445 Mass. 72, 77 (2005), cert. denied, 546 U.S. 1187 (2006), quoting Commonwealth v. Fraser, 410 Mass. 541, 545 (1991).  Assessing the totality of the circumstances leading to the stop of the defendant, we

conclude that the facts known to the police at the time of the seizure were not sufficient to establish reasonable suspicion that the defendant was connected to the alleged shooting at the victim's vehicle.

a.  The description of the suspects.  Neither the initial dispatch about the alleged shooting nor the police interview of Santos produced anything more than a very general description of the possible perpetrators.  Consequently, when the police stopped the defendant and the other members of the group, they knew only that "a group of young black males" had run into the Washington Elms housing complex immediately after Santos heard what she assumed to be gunfire.  Other than the race and age of the group seen running into the housing complex, the police had none of the usual descriptive information such as distinctive clothing, facial features, hairstyles, skin tone, height, weight, or other physical characteristics that would have permitted them to reasonably and rationally narrow the universe of possible suspects.

"We have no hard and fast rule governing the required level of particularity [of a description]; our constitutional analysis ultimately is practical, balancing the risk that an innocent person . . . will be needlessly stopped with the risk that a guilty person will be allowed to escape."  Commonwealth v. Lopes, 455 Mass. 147, 158 (2009).  Nonetheless, we have been

consistent in the view that a general description such as "a group of young black males" falls far short of the particularity necessary to establish individualized suspicion that a suspect is committing, has committed, or is about to commit a crime. See e.g., Warren, 475 Mass. at 535 (description of suspects as "two black males" wearing "dark clothing" and "one black male" wearing a "red hoodie," without any information as to other physical characteristics, lacked sufficient detail to constitute particularized reasonable suspicion); Commonwealth v. Walker, 443 Mass. 867, 872-873, cert. denied, 546 U.S. 1021 (2005) (description of robber by race alone without other factors suggestive of criminal activity insufficient for reasonable suspicion); Commonwealth v. Cheek, 413 Mass. 492, 496 (1992) (description of suspect as "black male with a black 3/4 length goose" coat insufficient for individualized suspicion, as it could have fit large number of men).  Therefore, the mere presence of a nondescript group of young black males standing near the scene of a reported shooting did not, standing alone, sufficiently narrow the range of possible suspects to include this group of individuals.

We recognize that the value of a vague or general description in the reasonable suspicion analysis may be enhanced if other factors known to the police make it reasonable to surmise that the suspect was involved in the crime under

investigation.  Mercado, 422 Mass. at 371 (general description alone not sufficient to establish reasonable suspicion requisite to justify stop, but when combined with other factors "may allow the police to narrow the range of suspects to particular individuals").  In this case, however, the totality of facts known to the police at the time of the seizure lacked sufficient detail to add flesh to the bare-bones description provided by Santos.  Rather, the information then available to the police detracted from any value Santos's description may have had in identifying the group as suspects in the shooting.  More specifically, it does not appear that Santos ever identified the defendant and his companions as the same group she saw running into the courtyard.  Also, the defendant was wearing distinctive clothing, a fact not mentioned by Santos in her description of the fleeing group.  We note as well that the group did not engage in suspicious behavior or other conduct suggesting that only moments earlier, they had fired shots at Santos's vehicle.  See Commonwealth v. Pagan, 63 Mass. App. Ct. 780, 782-783 (2005) ("Strange, furtive, or suspicious behavior or movements can infuse otherwise innocent activity with an incriminating aspect").  Thus, Santos's very general description of the group seen running into the housing complex added nothing of value to the reasonable suspicion calculus.

b.  High crime area.  The judge found that the stop occurred in a "high crime" area and ruled that this fact contributed to the police officers' reasonable suspicion that the defendant's group had fired the shot at Santos's vehicle.

Although the characterization of a particular neighborhood as a "high crime" area has been recognized as a factor in the reasonable suspicion analysis, Commonwealth v. Johnson, 454 Mass. 159, 163 (2009), we have been clear that "[j]ust being in a high crime area is not enough to justify a stop." Commonwealth v. Grandison, 433 Mass. 135, 139 (2001).  Indeed, whenever this factor is considered in the reasonable suspicion analysis, we have urged a cautious approach because "many honest, law-abiding citizens live and work in high-crime areas. Those citizens are entitled to the protections of the Federal and State Constitutions, despite the character of the area." Commonwealth v. Gomes, 453 Mass. 506, 512 (2009), quoting Commonwealth v. Holley, 52 Mass. App. Ct. 659, 663 (2001).  The exercise of that caution necessarily means that we look beyond the term "high crime area" to determine whether the inferences fairly drawn from that characterization "demonstrat[e] the reasonableness of the intrusion."  Johnson, supra.  Here, this factor lacks relevance in the reasonable suspicion calculus, as there was no negative inference to be drawn from the location of the stop.

c.  The nature of the reported crime.  The motion judge considered the report of shots fired as an "imminent threat to public safety" and, on that basis, concluded that the police were permitted to stop the defendant even without direct information that he had committed the crime under investigation. The judge relied on Commonwealth v. Foster, 48 Mass. App. Ct. 671, 674-675 (2000), where the Appeals Court held that a police officer may pat frisk an individual, even in the absence of reasonable suspicion of criminal activity, if the circumstances present an "imminent threat to public safety."  The judge also denied the defendant's motion for reconsideration based on our holding in Narcisse, 457 Mass. at 9, that "police officers may not escalate a consensual encounter into a protective frisk absent a reasonable suspicion that an individual has committed, is committing, or is about to commit a criminal offense and is armed and dangerous."  This was error.

First, our holding in the Narcisse case casts doubt on the wisdom of the judge's steadfast reliance on the Foster case as support for his ruling that the actions of the police officers were constitutionally permissible because of the nature of the crime under investigation, a report of gunshots being fired at a motor vehicle.  The rationale underlying Foster, derived principally from Commonwealth v. Fraser, 410 Mass. 541 (1991), was undercut substantially in Narcisse, where the court

specifically "disavow[ed] any suggestion in <u>Fraser</u> that we were establishing a new or lesser standard in our stop and frisk jurisprudence." <u>Narcisse</u>, 457 Mass. at 9. The motion judge erred, therefore, in disregarding this limitation of <u>Fraser</u>, which in turn called into question the continued vitality of <u>Foster</u>.

Second, although our cases have recognized that the "gravity of the crime and the present danger of the circumstances" may be considered in the reasonable suspicion calculus, we have not gone so far as to carve out a public safety exception based on this factor. See e.g., <u>Depina</u>, 456 Mass. at 247, and cases cited. In <u>Lopes</u>, 455 Mass. at 158, where the police were investigating a homicide, the court considered the nature of the crime but still conducted a reasonable suspicion analysis. There, the police stopped the defendant's vehicle despite minor discrepancies between that vehicle and the witness's description. The defendant's vehicle was similar in color to the suspect vehicle and had tinted windows, but it had a Cape Verdean flag hanging from the rear view mirror instead of from the "back" of the vehicle as described by the witness. <u>Id</u>. Although the court did not base its determination that the stop was constitutional on the nature of the crime, it was relevant to the analysis. The court assessed the constitutionality of the stop, framing the issue in

terms of reasonableness, and concluded that "[a]n objectively reasonable police officer [investigating a homicide] would not have allowed the van to pass simply because the Cape Verdean flag hung from the inside rear view mirror rather than the 'back' of the van." Id. at 158.

Likewise, in Depina, 456 Mass. 246, the court considered whether a stop of the defendant in the immediate vicinity of and close in time to a recent shooting was justified by reasonable suspicion. Although the nature of the crime was a factor in the reasonable suspicion calculus, the court considered the totality of the information known to the police, including the defendant's geographical and temporal proximity to the scene of the crime and his suspicious behavior in the wake of the shooting, in determining that the stop of the defendant was constitutionally justified. Id. at 247. Thus, the fact that the crime under investigation was a shooting, with implications for public safety, was relevant but not dispositive in determining the reasonableness of the stop.

d. Geographical and temporal proximity to the crime. The seizure of a suspect in geographical and temporal proximity to the scene of the crime appropriately may be considered as a factor in the reasonable suspicion analysis. Commonwealth v. McKoy, 83 Mass. App. Ct. 303, 313 (2013). The judge found that the defendant and his companions were "literally around the

corner" from where Santos saw the group of black males run into the courtyard only minutes after the alleged shooting occurred. This geographical and temporal proximity was relevant to the reasonable suspicion calculus. The inference from such proximity adds little value to that calculus here, however, where the police had no information connecting the defendant and his companions to the group Santos had seen running into the courtyard. Santos was present on the scene and participated in the take-down of the distinctively dressed defendant, but she made no identification of the group, and the judge made no finding that she ever confirmed that the group approached by the police was the same group she had seen earlier.

e. The defendant's flight from the scene. The motion judge concluded that the defendant's flight from the scene as the officers began pat frisking the other members of the group "creat[ed] more suspicion that he might be armed or involved in illicit activity." We disagree.

As noted, the seizure occurred when Officer Porter began to pursue the defendant to prevent his avoidance of the patfrisk that already had begun with the other members of the group, not later in the encounter when the police commanded the defendant to stop. Therefore, the issue of flight as a factor in reasonable suspicion is focused on defendant's action in backing away to avoid a patfrisk to which he did not consent. In the

absence of constitutional justification for a threshold inquiry, "our law guards a person's freedom to speak or not to speak to a police officer.  A person also may choose to walk away [or run away], avoiding altogether any contact with police."  Warren, 475 Mass. at 538, quoting Barros, 435 Mass. at 178 (breaking eye contact and refusing to answer officer's initial questions did not provide reasonable suspicion for detention or seizure as "[i]t was the defendant's right to ignore the officer").  Having not consented to the patfrisk, the fact that the defendant backed away from the scene permits no inference of criminal activity.

f.  Officer safety.  The judge ruled that the police were justified by concerns for their safety in seizing the defendant.  The judge's findings, however, undermine that conclusion.  In assessing the credibility of Officer Munro's testimony, the judge found that she "had no information that [the defendant] had committed a crime at the time [the police initiated the chase] into the courtyard."  That finding eliminated the defendant as a suspect in the crime under investigation and, more generally, as a suspect in any other criminal activity.  Because the crime under investigation involved the discharge of a firearm and none of the information available to the police supported a reasonable belief that the defendant had committed that crime or that he was armed, we are not persuaded that the

concern for officer safety supports the reasonable suspicion calculus.

Conclusion.  The convictions are vacated and the matter is remanded for further proceedings consistent with this opinion.

So ordered.