D.M., COMMONWEALTH vs., 100 Mass. App. Ct. 211

 
 COMMONWEALTH vs. D.M.

100 Mass. App. Ct. 211
 June 2, 2021 - September 14, 2021

Court Below: Juvenile Court, Suffolk County
Present: Milkey, Desmond, & Englander, JJ.

 

Firearms. Practice, Criminal, Motion to suppress. Constitutional Law, Search and seizure, Reasonable suspicion, Stop and frisk. Search and Seizure, Reasonable suspicion, Threshold police inquiry. Threshold Police Inquiry.

A Juvenile Court judge erred in denying a juvenile's pretrial motion to suppress a firearm discovered by police following an investigatory stop and patfrisk, where, viewing all the circumstances in their entirely, the police, at the time they seized the juvenile, who was seated inside a barbershop, lacked reasonable and individualized suspicion that the juvenile had committed or was committing a crime, given the minimal and vague information provided in a tip by a confidential informant (i.e., that, in a busy commercial area, a young Black male dressed in a black hooded sweatshirt and blue jeans was in possession of a firearm), and given the lack of other factors indicating that the juvenile was in possession of a firearm; and where the other factors relied on by the judge (i.e., the nature of the crime being investigated, the temporal proximity to the tip, and the high crime nature of the area) could not justify a stop. [214-220]

INDICTMENT found and returned in the Suffolk County Division of the Juvenile Court Department on November 27, 2015. 

 Following review by the Supreme Judicial Court, 480 Mass. 1004 (2018), a pretrial motion to suppress evidence was heard by Peter M. Coyne, J., and a conditional plea of guilty was accepted by him. 

 Dennis M. Toomey for the juvenile.

 Julianne Campbell, Assistant District Attorney, for the Commonwealth.

 DESMOND, J. Following an investigatory stop and patfrisk that resulted in the discovery of a firearm, the juvenile defendant was charged with carrying a firearm without a license, and he was subsequently indicted on that charge as a youthful offender. The juvenile filed a motion to suppress the firearm arguing that the police lacked reasonable suspicion for the stop and subsequent patfrisk. Following an evidentiary hearing, the judge denied the

 Page 212 

motion. Thereafter, the juvenile pleaded guilty to the charge, conditioned upon his right to appeal the denial of his motion to suppress. See Commonwealth v. Gomez, 480 Mass. 240, 252 (2018); Mass. R. Crim. P. 12 (b) (6), as appearing in 482 Mass. 1501 (2019). Because we conclude that the police lacked reasonable suspicion to stop the juvenile based on a nondescript tip from a confidential informant (CI), we reverse the order denying the motion to suppress.

 Background. The judge made the following findings of fact, which we supplement with evidence in the record that was explicitly credited by the judge. [Note 1] See Commonwealth v. Jones-Pannell, 472 Mass. 429, 432 (2015). On Monday, September 21, 2015, a CI contacted Boston Police Detective Daniel Griffin, of the drug control unit, informing him that "a young, [B]lack male dressed in a black hoodie and blue jeans was in possession of a firearm," [Note 2] and was located between Devon Street and Stanwood Street on Columbia Road in the Dorchester section of Boston. The CI further informed Detective Griffin that the male was accompanied by another Black male wearing "an off-white colored hoodie." As soon as he received this information, [Note 3] Detective Griffin relayed it to Sergeant Detective Bickerton, a supervisor of the Boston police department's youth violence strike force, and several officers from that unit proceeded to Columbia Road. 

 Two members of that unit, Officers Matthew Conley and Taylor Small, [Note 4] arrived at the area of Columbia Road in separate unmarked police cruisers with their respective partners. [Note 5] Officer Conley got out of his vehicle, and as he walked toward the corner of Columbia Road and Stanwood Street, he observed a Black

 Page 213 

 male, standing alone, wearing an off-white hooded sweatshirt. He recognized this male as Ricky Norwood. Conley was aware that Norwood was an associate of the "Columbia Road Gang," and that he had had prior firearm charges leveled against him. Officer Conley and his partner approached Norwood, had a conversation with him and pat frisked him, but they did not discover any firearms in his possession. [Note 6] 

 Not seeing anyone accompanying Norwood or fitting the description provided by the CI, Officer Small began to canvass the area for a Black male wearing a black hooded sweatshirt and blue jeans. While doing so, Officer Small noticed a Black male, wearing a black and gray hooded sweatshirt, standing outside on the sidewalk between a barbershop and a liquor store on Columbia Road. The male "was on the phone" and appeared to be "looking up and down the street, staring at [the officers]." The officers approached the male, later identified as Darius Hollis Carmen, and conducted a patfrisk of his person. They did not find any weapons in his possession. After the officers completed their interaction with Carmen, Carmen and Norwood walked away from the area together. 

 While continuing to look for the person described by the CI, Officer Small walked past the barbershop and noticed another Black male, wearing a black sweatshirt and blue jeans, seated inside. He alerted Officer Conley, who then peered inside the window of the barbershop and saw the juvenile. Officer Conley was familiar with the juvenile from prior encounters and knew him to be under the age of eighteen. He also knew that he was an "associate" of the Columbia Road gang. Officer Conley informed Sergeant Detective Bickerton and Officer Small of his observation, and the officers entered the barbershop. The juvenile was seated in a row of chairs by the entrance and "talking on the phone." The officers approached the juvenile and "instructed him to get off the phone and . . . to stand up." The juvenile asked why, and the officers "pulled him up . . . to stand." Once the juvenile was upright, the officers observed a bulge on the right side of his waist. The officers, from their training and experience, believed the bulge to be consistent with a firearm. Officer Small pat frisked the juvenile and felt what he believed to be a firearm. He lifted the juvenile's shirt and removed a firearm from his waistband. The

 Page 214 

 juvenile was immediately brought to the floor and placed under arrest. 

 Discussion. 1. Standard of review. "In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error and leave to the judge the responsibility of determining the weight and credibility to be given . . . testimony presented at the motion hearing." Commonwealth v. Meneus, 476 Mass. 231, 234 (2017), quoting Commonwealth v. Wilson, 441 Mass. 390, 393 (2004). We, however, "review independently the application of constitutional principles to the facts found." Commonwealth v. Warren, 475 Mass. 530, 534 (2016), quoting Wilson, supra. "The Commonwealth bears the burden of demonstrating that the actions of the police officers were within constitutional limits." Meneus, supra.

 2. Reasonable suspicion. The judge ruled, and the Commonwealth concedes, that the juvenile was seized, or stopped in the constitutional sense, when the officers approached the juvenile in the barbershop, ordered him to stand up, and then "put their hands on him to assist him from the chair." See Commonwealth v. Matta, 483 Mass. 357, 363 (2019) (seizure effected where, "in the circumstances, a reasonable person would believe that an officer would compel him or her to stay"); Commonwealth v. Shane S., 92 Mass. App. Ct. 314, 322 (2017) (juvenile constitutionally seized when officer put his hands on juvenile's chest).

 "Once a seizure has occurred," the question becomes whether, at the time of the seizure, the police had "reasonable suspicion that the person was committing, had committed, or was about to commit a crime." Meneus, 476 Mass. at 235, quoting Commonwealth v. Martin, 467 Mass. 291, 303 (2014). Reasonable suspicion "must be grounded in 'specific, articulable facts and reasonable inferences [drawn] therefrom' rather than on a hunch." Warren, 475 Mass. at 534, quoting Commonwealth v. DePeiza, 449 Mass. 367, 371 (2007). "The essence of the reasonable suspicion inquiry is whether the police have an individualized suspicion that the person seized is the perpetrator of the suspected crime." Warren, supra. See Commonwealth v. Depina, 456 Mass. 238, 243 (2010).

 According to the judge, the following information provided the police with reasonable suspicion to stop the juvenile: the reliability of the CI, the level of detail provided by the CI, the fact that the juvenile "matched the description of a young, [B]lack man 

 Page 215 

with a gun," [Note 7] the serious nature of the crime being investigated, the geographic and temporal proximity of the juvenile to the information contained in the CI's tip, and the fact that the incident took place in a high crime neighborhood. [Note 8] We, however, are not persuaded that the tip provided by the CI, combined with other information known to the officers, was sufficiently specific to establish reasonable suspicion for the stop.

 a. Reliability of the CI. To demonstrate that the information provided by the CI "bears adequate indicia of reliability, the Commonwealth must show the basis of knowledge of the source of the information (the basis of knowledge test) and the underlying circumstances demonstrating that the source of the information was credible or the information reliable (veracity test)." Commonwealth v. Lopes, 455 Mass. 147, 155-156 (2009). "Because the standard is reasonable suspicion rather than probable cause, a less rigorous showing in each of these areas is permissible." Commonwealth v. Lyons, 409 Mass. 16, 19 (1990).

 At the hearing on the motion to suppress, Detective Griffin testified that he knew the CI's identity, that he had worked with this CI in the past, and that, between 2010 to 2014, the CI had provided information that led to the arrest of four individuals for the possession of firearms and recovery of those firearms. [Note 9] That testimony more than satisfied the veracity test, and although there was less information provided regarding the CI's basis of knowledge,

 Page 216 

 we do not here question that the CI's information was sufficiently reliable, under the less rigorous standard of Lyons, such that the police were entitled to rely on it during their investigation of the tip. See Commonwealth v. Byfield, 413 Mass. 426, 431 (1992) (informant's veracity established where prior information led to arrest and conviction). See also Commonwealth v. Alfonso A., 438 Mass. 372, 376 (2003) (police knowledge of informant's identity weighs in favor of reliability).

 b. Particularity of description and whether it matched the juvenile. The fact that the information bore the requisite indicia of reliability does not end the inquiry. See Depina, 456 Mass. at 243. The Commonwealth must also prove that the description of the suspect "was sufficiently detailed and particularized that it was reasonable for the police to stop any person matching that description." Id. at 245. While "the description need not be so particularized as to fit only a single person, . . . it cannot be so general that it would include a large number of people in the area where the stop occurs." Id. at 245-246.

 The physical description of a young Black man in a black hooded sweatshirt and blue jeans was itself quite general. The accompanying information -- that the suspect, at approximately 5 p.m. on a Monday in September, was located on Columbia Road (a busy commercial area) [Note 10] with another Black male in an off-white hooded sweatshirt -- did little to narrow or particularize the description. Notably, the CI did not provide any information regarding "facial features, hairstyles, skin tone, height, weight, or other physical characteristics," Warren, 475 Mass. at 535, such that the officers would have the ability to distinguish the suspect from any other younger-looking Black males wearing that type of clothing in that area. Nor was this a situation where, given the time of day, it was unlikely that there would be others around who might match the description. See Commonwealth v. Privette, 100 Mass. App. Ct. , (2021). Indeed, prior or simultaneous to stopping the juvenile, the officers stopped and pat frisked two other Black males in the area, [Note 11] both of whom were wearing hooded sweatshirts. See Depina, 456 Mass. at 246 (description

 Page 217 

 "plainly not singular" where it may have eliminated some people but fit others in area).

 Our case law is clear that this type of bare-bones description, without more, is insufficient to give the police reasonable suspicion to stop anyone who fits the description. See Warren, 475 Mass. at 535-536 (description of three Black men, two with dark clothing and one with red hooded sweatshirt, not sufficient for reasonable suspicion); Meneus, 476 Mass. at 236-237 (description of "a group of young [B]lack males" not sufficiently particular to establish reasonable suspicion); Commonwealth v. Cheek, 413 Mass. 492, 496 (1992) ("description of the suspect as a '[B]lack male with a black 3/4 length goose [jacket]'" not sufficient for reasonable suspicion because it "could have fit a large number of men who reside in . . . a predominantly [B]lack neighborhood of the city"); Commonwealth v. Doocey, 56 Mass. App. Ct. 550, 557 (2002) ("The general descriptive characteristics of a man dressed all in black . . . would not, standing alone, provide distinguishing traces of sufficient particularity to allow for the identification of a suspect").

 Moreover, the location of the juvenile was at least somewhat at odds with the description provided by the CI. The juvenile was not with another Black male wearing an off-white hooded sweatshirt, nor was he standing outside in the area of Columbia Road and Devon and Stanwood Streets. The police determined that the male described as wearing the off-white sweatshirt was Norwood, and Norwood was not seen standing with the juvenile or close to the barbershop where the police observed the juvenile. [Note 12] 

 Further, although the judge concluded that the juvenile "matched" the description of a "[B]lack man with a gun," the fact that a gun was ultimately recovered after the seizure is not a permissible consideration when determining whether the police had reasonable suspicion "at the time of the stop." Harris, 93 Mass. App. Ct. 56, 62 (2018). See Commonwealth v. Hilaire, 92 Mass. App. Ct. 784, 790 (2018) ("[r]easonable suspicion cannot rest on later-developed facts not shown to have been known to 

 Page 218 

officers at the relevant time"). Therefore, unless other facts and inferences known to the police at the time of the stop strengthened the bare-bones description and their individualized suspicion of the juvenile, the juvenile "was entitled to proceed uninhibited." Warren, 475 Mass. at 536.

 c. Nature of the crime being investigated. The judge considered "the serious nature of the crime being investigated" as a factor weighing toward reasonable suspicion. Certainly, "[t]he gravity of the crime and the present danger of the circumstances may be considered in the reasonable suspicion calculus." Depina, 456 Mass. at 247. There is no doubt that when a police officer receives information concerning an individual with a gun, prompt investigation is warranted.

See Doocey, 56 Mass. App. Ct. at 557 n.12. But "carrying a concealed firearm, by itself, is not a crime." Matta, 483 Mass. at 366. Thus, a "tip 'suggesting a concealed firearm, with nothing more, [cannot] provide reasonable suspicion for a stop.'" Id., quoting DePeiza, 449 Mass. at 373.

 Here, based on the information provided by the CI, the police were investigating what was a possible crime. The CI described the suspect as "young" but did not describe him as a juvenile who could not lawfully possess a firearm, see G. L. c. 140, § 131 (d) (iv), and thus investigation was required to determine if the CI was reporting activity that was criminal. Further, there was no suggestion that the "the gun present[ed] an imminent threat [to public safety] because of shots just fired, or likely to be fired," Doocey, 56 Mass. App. Ct. at 557, such that "there [was] an edge added to the [reasonable suspicion] calculus." Id. See Commonwealth v. Evelyn, 485 Mass. 691, 705 (2020) (where crime being investigated was a shooting, "circumstances indicated a potential ongoing risk to public safety and therefore weighed in favor of reasonable suspicion"). As a result, the tip alone was insufficient to give rise to reasonable suspicion for the stop.

 While further investigation and additional factors may support an officer's reasonable suspicion that a person is carrying a firearm illegally, none of the classic factors was present here. See DePeiza, 449 Mass. at 373-374, and cases cited. The juvenile did not make any furtive movements, and there was no indication that he was attempting to conceal anything from the officers prior to being stopped. [Note 13] Contrast id. (defendant walked with "'straight arm' gait," made nervous movements, and attempted to conceal

 Page 219 

 pocket from officers); Shane S., 92 Mass. App. Ct. at 322-323 (juvenile ran with "arms held in an unusual manner against his body" consistent with concealing firearm). To be sure, Officer Conley was aware that the juvenile was under the age of eighteen and could not lawfully possess a gun. But this knowledge added little, if anything, to his reasonable suspicion that the juvenile was in possession of a firearm because the CI's tip did not identify the suspect as a juvenile, and no other factors suggested that the juvenile possessed a gun at the time of the stop.

 d. Proximity. The geographic and temporal proximity of a stop to a reported crime is also relevant to the reasonable suspicion analysis. See Evelyn, 485 Mass. at 704; Meneus, 476 Mass. at 240. "Proximity is accorded greater probative value in the reasonable suspicion calculus when the distance is short and the timing is close." Warren, 475 Mass. at 536. Here, the juvenile was located on the same block that the CI reported the suspect to be on, and he was stopped within three hours of, and likely just thirty minutes after, receipt of the tip. See note 3, supra. Thus, proximity was certainly a factor to be considered, but proximity alone is not enough to provide the police with reasonable suspicion for a stop. See Commonwealth v. Mercado, 422 Mass. 367, 371 (1996). In these circumstances, we do not consider the temporal proximity to the CI's tip regarding the juvenile to be particularly significant because the police were not investigating "a recent crime," see Evelyn, supra, and the juvenile's proximity to the reported area "did not help to single him out from any other [B]lack male in the area" wearing similar clothing. Cheek, 413 Mass. at 496.

 e. High crime neighborhood. Lastly, the judge considered it to be relevant that the juvenile was stopped in a high crime neighborhood. The officers testified that they had been involved in investigations and arrests for firearm-related offenses, shootings, and homicides in the area of Columbia Road, and there was also testimony that the area was a "popular congregation spot" for the Columbia Road gang. Even so, the nature of the neighborhood in and of itself cannot justify an intrusion upon anyone present in that area. See Cheek, 413 Mass. at 496-497 ("Where there is a report of a crime in a neighborhood which police consider to be a 'high crime area,' law enforcement officials may not conduct a 

 Page 220 

broad sweep of that neighborhood stopping individuals who happen to live in the area and be about, hoping to apprehend a suspect"). "[W]e consider this factor only if the 'high crime' nature of the area has a 'direct connection with the specific location and activity being investigated.'" Evelyn, 485 Mass. at 709, quoting Commonwealth v. Torres-Pagan, 484 Mass. 34, 41 (2020). We agree with the juvenile that, in the circumstances of this case, this factor carries little weight.

 Here, on a weekday at 5:30 p.m. in September, the juvenile was seated inside a barbershop located on a busy commercial section of Columbia Road, which is a road that spans over four miles, from South Boston to Dorchester. [Note 14] See United States v. Wright, 485 F.3d 45, 54 (1st Cir. 2007), quoting United States v. Montero-Camargo, 208 F.3d 1122, 1138 (9th Cir. 2000) ("We must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business"). The only information connecting the juvenile to the neighborhood, and its "high crime" nature, was Officer Conley's awareness that the juvenile was a "close associate" of a member of the Columbia Road gang. [Note 15] That was simply not enough to justify a stop. See Commonwealth v. Quezada, 67 Mass. App. Ct. 693, 697 (2006), quoting Commonwealth v. Pierre P., 53 Mass. App. Ct. 215, 218-219 (2001) ("stop and frisk not justified based on membership in gang, even in high crime area").

 Conclusion. Viewing all the facts and circumstances in their

 Page 221 

 entirety, we conclude that the police lacked reasonable and individualized suspicion that the juvenile had committed or was committing a crime prior to his seizure. With only the minimal and vague information provided by the CI, and no other factors indicating that the juvenile was in possession of a firearm, the police lacked "specific, articulable facts" necessary to justify the stop. Warren, 475 Mass. at 534, quoting DePeiza, 449 Mass. at 371. As a result, the order denying the motion to suppress is reversed, and the matter is remanded to the Juvenile Court where the juvenile may seek to withdraw his guilty plea.

So ordered.

FOOTNOTES
[Note 1] The judge credited the testimony of all the testifying officers. 

[Note 2] The judge also found that the CI informed the police that the firearm was located on the right side of the suspect's waist, but that finding was erroneous, as there was no testimony to that effect elicited at the motion to suppress. See Commonwealth v. Hilton, 450 Mass. 173, 178 (2007) (finding is clearly erroneous when there is no evidence to support it). 

[Note 3] To avoid identification of the CI, the Commonwealth informed defense counsel during discovery that the tip had been made sometime within three hours prior to the juvenile's arrest, which occurred at approximately 5:30 p.m. On appeal, however, the Commonwealth relies on testimony at the hearing to assert that the tip was received at 5 p.m. 

[Note 4] By the time of the suppression hearing, Small had attained the rank of detective. Consistent with the judge's findings, we refer to him as Officer Small. 

[Note 5] The officers testified that they arrived at Columbia Road at approximately 5:30 p.m. 

[Note 6] There was no explanation provided for the patfrisk of Norwood. The CI did not indicate that a Black male in an off-white hooded sweatshirt was in possession of a firearm. 

[Note 7] On direct examination, none of the officers indicated that they knew or were told that the suspect was young. The suspect's age was mentioned for the first time by defense counsel on cross-examination of Detective Griffin, the last witness to testify at the hearing, when she asked, "Now, the tip that you got from the informant in this case said that they would be a young, [B]lack male with a firearm, correct?" Detective Griffin merely adopted defense counsel's characterization of the tip and answered, "That's correct." Considering the testimony at the hearing as a whole, we are not confident that the CI described the suspect as young. Nevertheless, even crediting the word "young," as the judge did, the description was vague and lacked particularity. 

[Note 8] The judge also relied on the officers' observations of a bulge in the juvenile's waistband. This was error given that those observations undisputedly took place after the stop was effectuated. See Commonwealth v. Harris, 93 Mass. App. Ct. 56, 61-62, 64 (2018) (where stop occurred prior to observation of knife, observation not to be considered in reasonable suspicion analysis). 

[Note 9] We note that Detective Griffin initially testified that information provided by the CI on previous occasions had resulted in over fifty search warrants and twenty-five arrests. After defense counsel objected that the larger numbers were not provided in discovery, the judge struck the "[t]estimony concerning the [twenty-five] arrests," and Detective Griffin's testimony was limited to the CI's information leading to four arrests. 

[Note 10] Officer Conley testified that the barbershop where the juvenile was stopped was located in a busy area, surrounded by stores, restaurants, and nearby schools. 

[Note 11] The Commonwealth invites us to disregard the fact that two other Black males were pat frisked prior to the stop of the juvenile. We decline the invitation. It is our obligation to consider "the totality of the circumstances -- the whole picture" -- when determining whether there was reasonable suspicion for the stop. Commonwealth v. Fraser, 410 Mass. 541, 545 (1991), quoting United States v. Cortez, 449 U.S. 411, 417 (1981). 

[Note 12] Officer Conley testified that Norwood was standing approximately fifty feet away from the location of the barbershop. Notwithstanding this distance and the fact that Norwood was outside on the sidewalk and the juvenile was inside the barbershop, the Commonwealth characterizes the two as being "together." We reject that characterization. 

[Note 13] Indeed, Officer Conley testified that the juvenile did not reach for or pat his waist area, nor did he try to leave the barbershop or conceal his appearance when he saw the officers entering. By all accounts, the juvenile acted reasonably. 

[Note 14] We may take judicial notice of geographical locations. See Commonwealth v. Augustine, 472 Mass. 448, 457 n.14 (2015). The judge found that the barbershop in which the juvenile was stopped was "directly across the street from" 270 Columbia Road, which Officer Conley testified was known to be an address that represented the Columbia Road gang. This, however, was erroneous. 270 Columbia Road is located on the same side of the street and two blocks away from the barbershop. 

[Note 15] The term "associate" is frequently used but rarely defined when referring to a person's relationship to a gang when that person is not in fact a member of the gang. "Associate" is defined as "[a] person united with another or others in an act, an enterprise, or a business, a partner or colleague"; "[o]ne that habitually accompanies or is associated with another"; "[a] member of an institution or society who is granted only partial status or privilege"; "[j]oined with another or others and having partial status or privileges." American Heritage Dictionary of the English Language 112 (3d ed. 1992). We are hesitant to place the weight of such a loaded term on the juvenile when the exact nature of the juvenile's relationship with the gang and its members was not explained or defined by the testifying officer. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.