SUPERIOR COURT 
 
 COMMONWEALTH v. JEIFFRY ROSARIO

 
 Docket:
 2284CR00697
 
 
 Dates:
 June 21, 2024
 
 
 Present:
 William F. Bloomer Justice of the Superior
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS (Paper No. 19)
 
 

             The defendant, Jeiffry Rosario ("Rosario"), moves to suppress a firearm seized from him by members of the Boston Police Department ("BPD") on August 1, 2022, in Dorchester. Following a hearing, and for the reasons set forth below, Rosario's motion to suppress is DENIED.
FINDINGS OF FACT
            On June 3, 2024, the court heard testimony from BPD Detective Christopher Kennedy ("Kennedy") and received fifteen exhibits in evidence. Rosario did not testify. The court makes the following factual findings based on the credible evidence produced at the hearing and the reasonable inferences drawn from that evidence. In making these findings, the court finds the testimony of Kennedy truthful and accurate on the relevant and material points set forth below.
            Kennedy has been a BPD police officer for fourteen years. He is currently assigned to BPD's Homicide Unit. Kennedy has worked in different capacities during his career with the BPD, including as a member of the Youth Violence Strike Force and as a patrolman in District B-2, which covers Roxbury and parts of Dorchester.
            At approximately 2:10AM on August 1, 2022, BPD received two "ShotSpotter" activations near the intersection of Washington Street and Columbia Road. Sec Exs. 9 and 10
 
                                                            -1-
 
(BPD incident reports). The first activation detected four gunshots, and the second activation detected one. Kennedy explained that "ShotSpotter" mics are stationed at various locations throughout the city and an alert is sent to officers within approximately one minute of the system detecting gunfire. ShotSpotter detects the number of rounds fired within a guaranteed radius of 85 feet and records the time and the sound of the gunshots. The system also maps the approximate location of the detected gunfire.
            Kennedy, who works the 4:00PM to 11:45PM shift, stayed late at the District B-2 substation into the early morning hours of August 1, 2022. While at the station, he received notice of the ShotSpotter activations through an app on his cellphone. Kennedy accessed the ShotSpotter system and learned that four gunshots had been detected near the intersection of Columbia Road and Washington Street. See Ex. 1 (ShotSpotter summary depicting area of four gunshots). He also learned that another gunshot had been detected at the intersection of these two streets. See Ex. 2 (ShotSpotter summary depicting area of single gunshot). The first volley of gunfire occurred at 2:10:48/\M. The second gunshot was detected at 2:10:55AM.
            Upon receiving the ShotSpotter notifications, Kennedy accessed BPD's camera system at the intersection of Columbia Road and Washington Street. Sec Ex. 3 (thumb drive containing video recording). Kennedy viewed the video recording around the time of the incident and initially observed a black sedan take a quick right turn from Columbia Road onto Washington Street after the shooting and broadcast the information over the radio. See Ex. 3 (thumb drive containing turret tapes). Upon further review of the video recording, Kennedy determined the black sedan was not involved in the shooting and broadcast to other officers to disregard his initial assessment. Continuing his review of the video recording, Kennedy learned that a blue, older model ("early 2000-ish") Honda CR-V with a spare tire attached to the trunk door was
 
                                                            -2-
 
involved in the shooting. The camera angle allowed Kennedy to observe the passenger-side of the CR-V. Kennedy observed that the passenger-side wheel rims on the CR-V were different and that there was some damage above the rear wheel well. The vehicle drove up Columbia Road and stopped in the right-hand travel lane before the intersection with Washington Street. Kennedy next saw a white Honda Accord headed in the same direction as the blue CR-V stop in the left-hand travel lane of Columbia Road near the CR-V.
            As the two cars remained stationary at the intersection, a male in the CR-V crawled up and out of the rear passenger-side window and sat on the windowsill of the door facing in the direction of the white Honda Accord. The male's back faced the camera. He held a gun behind his back in his right hand. Kennedy observed the male making gestures towards the white Honda Accord with his left hand. Kennedy described the male as a light-skinned Hispanic male with "puffy" or curly hair and wearing a white t-shirt. Kennedy next saw this male take the handgun from behind his back, point it at the white Honda, and open fire. The vehicles continued through the intersection where another shot was fired. Kennedy broadcast his belief that a blue, older model Honda CR-V was involved in the shots-fired incident. At approximately 2:18AM, he emailed a screen shot of the CR-V to officers assigned to area 13-2 and other nearby districts to be on the lookout for this vehicle.
            Kennedy reviewed footage from Boston Police and City of Boston Transportation Department cameras in an effort to track the movements of the blue Honda CR-V. These cameras are located at various intersections along Columbia Road. following the shooting, Kennedy observed the CR-V travel up Columbia Road toward I3lue Hill Avenue, where the vehicle made a U-turn. The camera at the intersection of Columbia Road and Washington Street captured the CR-V traveling down Columbia Road in the opposite direction it drove immediately
 
                                                            -3-
 
following the shooting. Kennedy then tracked the CR-V traveling on Columbia Road through several intersections and heading in the direction of Stoughton/Dudley Street.[1] See Exs. 4 - 6 (photos of intersections along Columbia Road). The last camera to capture the CR-V's movements was located at the intersection of Columbia Road and Hancock Street. See Exs. 7 and 8 (map depicting route of travel of CR-V). The CR-V did not appear in the footage for the next camera located along Columbia Road at the intersection of Columbia Road and Stoughton/Dudley Street. The area where Kennedy lost track of the vehicle is marked with an " X" on exhibit 8 (map of route taken by CR-V).
            Kennedy then learned that the victim of the shooting had gone to the District B-3 station to report the incident. Kennedy and Detective Anton Ramos ("Ramos") decided to drive to District B-3 to interview the victim rather than requiring this person to travel to the B-2 station. On their way to District B-3, Kennedy and Ramos traced the route of the CR-V after the gunfire. Kennedy drove an unmarked police cruiser. He took a right on Cushing Avenue just past the intersection of Columbia Road and Hancock Street, where the CR-V was last captured on camera. See Ex. 13 (photo of Columbia and Cushing). Kennedy explained that Cushing Avenue was the only real option the driver of the CR-V had to turn off Columbia Road after intersecting with Hancock Street and before proceeding through the intersection of Columbia Road and Stoughton/Dudley Street.
            After taking a right onto Cushing Avenue, Kennedy saw a vehicle matching the description of the blue CR-V involved in the shooting stopped at the rear of the city parking lot for the Strand Theatre. As he pulled his cruiser into the parking lot and got closer to this vehicle, Kennedy realized it was the CR-V involved in the shooting. He also noted that the left rear
 
--------------------------------------------
 
[1] Dudley and Stoughton are essentially the same street, but they arc divided by Columbia Road.
 
                                                            -4-
 
passenger in the CR-V, later identified as Rosario, matched the description of the individual Kennedy observed on camera shooting at the white Honda Accord. He was a Hispanic male with "puffy" or curly hair wearing a white t-shirt. Kennedy positioned the front of his cruiser approximately five to ten feet from the front of the CR-V. See Exs. 13 and 14 (photos of CR- Y/cruiser). A female sat in the front passenger seat of the vehicle. A male and second female were outside the CR-V repairing the rear driver's side tire. A third female was present, but it is unclear where she was located when Kennedy and Ramos arrived.
            Kennedy approached the passenger side of the CR-V while Ramos approached the driver side. They ordered the occupants out of the vehicle with their guns drawn and in the "low ready" position. Kennedy radioed for assistance. He immediately went to Rosario, handcuffed him, and performed a pat frisk of his person with negative results. Eight to ten back-up officers began arriving approximately 30 seconds after Kennedy's radio call. All other occupants were ordered to the ground and placed in handcuffs.
            After handcuffing Rosario and waiting for back-up officers to arrive, Kennedy performed a frisk of the rear passenger compartment of the CR-V and found a snub-nosed Smith and Wesson revolver on the floormat underneath the front passenger seat but positioned so that it was closer to the rear passenger compartment. Kennedy knew from another officer that bullet
casings had not been found at the intersection of Columbia Road and Washington Street. Revolvers do not eject shell casings when fired. The revolver itself had no live rounds or spent casings in the cylinder. When another officer moved clothing about in the trunk area of the CR- V directly behind where Rosario had been sitting, a "jingling" sound was heard inside a pair of pants. Five spent bullet casings were found in the pants pocket. Kennedy also observed that the
 
                                                            -5-
 
CR-V had different wheel rims and damage to the rear, passenger side wheel well consistent with the appearance of the CR-V captured by cameras earlier.
            As detectives, neither Kennedy nor Ramos were outfitted with a body worn camera ("BWC"). Responding patrol officers arriving at the scene, however, were equipped with BWCs. One of the responding officer's BWC footage begins at approximately 2:42AM. It captures the events shortly after Rosario had been ordered out of the CR-V. Approximately 30 to 40 minutes elapsed between the ShotSpotter activations and the discovery of the CR-V and Rosario's arrest.
RULINGS OF LAW
            The Stop of the Defendant. In determining whether a seizure of a person has occured, "rather than focusing primarily on whether a reasonable person would have believed that he or she was free to leave, we look at the totality of the circumstances to determine whether a member of law enforcement has ' engaged in some show of authority' that a reasonable person would consider coercive; that is, behavior 'which could be expected to command compliance, beyond simply identifying [him-or herself] as police."' Commonwealth v. Matta, 483 Mass. 357, 362 (2019), quoting Commonwealth v. Sanchez, 403 Mass. 640, 644 (1988).  The court concludes that Rosario was "seized" for constitutional purposes when the police exited the unmarked
cruiser with their service weapons drawn and ordered him out of the CR-V.
            At that moment in time, the police had reasonable suspicion, if not probable cause, to stop the defendant. Article 14 provides that "[ e]very subject has a right to be secure from all unreasonable searches, and seizures, of his person." Commonwealth v. Privette, 491 Mass. 501, 507 (2023). "To justify an investigatory stop under art. 14, a police officer must have reasonable suspicion that the person stopped has committed, is committing, or is about to commit a crime."
 
                                                            -6-
 
Id. at 507, citing Commonwealth v. Costa, 448 Mass.  510,514 (2007).  The  reasonable suspicion analysis examines " the totality of the facts on which the seizure is based." Id., citing Commonwealth v. Meneus, 476 Mass. 231, 235 (2017). Reasonable suspicion "must be based on specific and articulable facts, and reasonable inferences therefrom, in light of the officer's experience." Id., citing Commonwealth v. Gomes, 453 Mass. 506, 511 (2009). See Terry v. Ohio, 392 U.S. 1, 21 (I 968). Reasonable suspicion also must be more than a hunch. Gomes, 453 Mass. at 511, citing Commonwealth v. Grandison, 433 Mass. 135, I 39 (2007).
            Several factors contribute to the reasonable suspicion calculus. First, the proximity of the CR-V to the intersection of Columbia Road and Washington Street and the brief passage of time between the shots-fired incident and detectives locating the CR-V cut in favor of the stop. See Meneus, 476 Mass. at 240 (seizure of suspect in geographical and temporal proximity to scene of crime appropriately considered in reasonable suspicion analysis). Detectives located the vehicle approximately thirty minutes after receiving notice of the ShotSpotter activations and relatively close to the intersection of Columbia Road and Washington Street. See Commonwealth v. Warren, 475 Mass. 530, 536(2016) ("Proximity is accorded greater probative value in the reasonable suspicion calculus when the distance is short and the timing is close.").
            Second, the appearance of the CR-V, its location in a city parking lot off Cushing Street, and the time of day all support a finding of reasonable suspicion. Kennedy testified that the la s t camera to capture the CR-V was located at the intersection of Columbia Road and Hancock Street and that the only real option the driver of the CR-V had to turn off Columbia Road if the vehicle did not travel through the intersection of Columbia Road and Stoughton/Dudley Street, where the next city camera was stationed, was Cushing Street. See Robinson-Van Rader, 492 Mass. 1, 12 (2023) (fact defendant found in location consistent with expected location and
 
                                                            -7-
direction of travel of suspect properly considered in reasonable suspicion analysis).  Upon turning onto Cushing Street from Columbia Road, Kennedy observed a CR-V matching the description of the vehicle involved in the shooting parked in a lot near the Strand Theatre. There were people inside and outside of the CR-V. Kennedy had personally viewed the camera footage that recorded the CR-V involved in the shots-fired incidents. Kennedy, an experienced police officer, could reasonably infer that the blue, older model CR-V parked in the lot with occupants at approximately 2:40AM was the same vehicle involved in the shots-fired incident approximately thirty minutes earlier.
            Third, Rosario's physical appearance was consistent with that of the shooter. Sec Commonwealth v. Henley, 488 Mass. 95, 103 (2021) (defendant matching physical description of suspect factor contributing to reasonable suspicion). Moreover, he sat in the rear passenger seat of the CR-V, the window to which the shooter crawled up and out of to open fire at the occupants of the white Accord.
            Finally, public safety concerns support the stop. Sec Commonwealth v. Depina, 456 Mass. 238, (2010) ("The gravity of the crime and the present danger of the circumstances may be considered in the reasonable suspicion calculus").  The incident involved a brazen shooting in the early morning hours on a major public way. The armed perpetrator had not been apprehended. Kennedy diligently traced the route of the CR-V involved in the shots-fired incident. He and Ramos came upon a vehicle matching the description of the CR-V involved in the shooting and occupied by a person matching the description of the shooter in the very seat that the assailant occupied during the shots-fired incident just one-half hour earlier.  There was, at a minimum, reasonable suspicion to conduct a stop of the defendant and the other occupants of the CR-V.
 
                                                            -8-
 
            The Show of Force. The court also concludes that the show of force was proportional to the circumstances of this case. It did not convert the seizure of the defendant into an immediate arrest. In Commonwealth v. Manha , the Supreme Judicial Court ("SJC") held that police, acting on information obtained from an anonymous 911 caller, had reasonable suspicion to stop and perform a protective sweep of the interior of the defendant's motor vehicle. 479 Mass. 44, 44 (2018). In Manha, the state police received a report from a 911 caller stating that an individual had pointed a gun at her during a road rage incident on Route 93 southbound in Boston. The caller gave a description of the male driver and vehicle involved in the incident. Id. at 45.
Troopers located and stopped the defendant's vehicle, although no traffic violations had occurred. Troopers approached the vehicle with their guns drawn and ordered Manha to step from the car. Id. A patfrisk of Manha revealed no weapons. Id. Troopers next performed a protective sweep of the interior of Manha's vehicle, eventually uncovering a case containing a pellet gun in the shape of a handgun in the rear area of the vehicle. Id.
            The SJC upheld the stop and search. After engaging in the two-prong analysis under Aguilar-Spinelli, the Court concluded that "the actions that the troopers took prior to discovering the pellet gun did not constitute an arrest." Id. at 48. The Court stated, "Given the possible danger to themselves and to the public, each step the troopers took was a 'reasonably prudent protective measure."' Id. at 49 (quotation and citations omitted).
            The same is true, if not more so, in the present case. Here, police did not act on information related to them by an anonymous 911 caller regarding an assault with a firearm but, instead, acted on Kennedy's direct observation from surveillance camera footage of actual gunfire directed at others in a separate vehicle on a major thoroughfare. Approaching the occupants of the CR-V believed to have been involved in the incident with their weapons in the
 
                                                            -9-
 
"low-ready" position was appropriate in these circumstances. "Taking appropriate precautions does not transform an investigatory stop into an arrest." Id. Nor did the use of handcuffs as a safety measure morph the stop into an arrest. See Commonwealth v. Phillips, 452 Mass. 617, 627 (2008) (handcuffing suspect and placing him at rear of cruiser for short duration to conduct identification procedure did not amount to arrest); Commonwealth v. Williams, 422 Mass. 111, 118 (1996) (use of handcuffs not dispositive in determining whether seizure of person was investigatory stop or arrest). "An officer is entitled to take reasonable steps to ensure his safety. Such steps do not automatically turn a stop into an arrest." Williams, 422 Mass. at 117 .
            The Scope of the Search. The search of the rear passenger compartment of the CR-V was a justifiable frisk or protective sweep for weapons. It is well settled that "in appropriate circumstances a Terry type search may extend into the interior of an automobile so long as it is limited in scope to a protective end." Commonwealth v. Douglas, 86 Mass. App. Ct. 404, 410- 412 (2014), quoting Commonwealth v. Almeida, 373 Mass. 266, 270 (1977). After frisking Rosario with negative results, Kennedy reasonably believed there might be a firearm in the CR-Y. Kennedy' s sweep encompassed the area of the floor directly in front of the rear passenger seat, where Rosario had been seated. See Commonwealth v. Alvarado, 427 Mass. 277, 284 (1998) (frisk of car interior properly extended to places where sawed-off shotgun could be hidden); Commonwealth v. Stack, 49 Mass. App. Ct. 227, 234 (2000) (frisk of car interior must be "confined to what is minimally necessary to learn whether the suspect is armed and to disarm him once the weapon is discovered."). Kennedy found the revolver underneath the front passenger seat but closer to where Rosario had been seated in the right, rear passenger seat.
            In Manha, the SJC held that the scope of the protective sweep of the defendant's vehicle was reasonable and constitutionally justified "because the nature of the suspected crime
 
                                                            -10-
 
constituted an imminent threat to the safety of the officers." 479 Mass. at 49. Again, the same is true, if not more so, in the instant case. Upon locating the firearm on the floor near the rear passenger compartment of the CR-V, and after observing the different wheel rims and damage on the passenger side of the CR-V, Kennedy and other officers had probable cause to search the vehicle, which was parked in a city parking lot. See Commonwealth v. Sheridan , 470 Mass. 752, 756 (2015) (discussing warrantless search of vehicle under "automobile exception" to warrant requirement). The seizure of the empty shell casings in a pair of pants found directly behind the seat upon which Rosario sat was lawful.
ORDER
            For the aforementioned reasons, the defendant's motion to suppress (Paper No. 19) is DENIED.