COMMONWEALTH *VS.* DAMIEN PERRY.

No. 03-P-1335.

Suffolk. September 15, 2004. - November 23, 2004.

Present: DUFFLY, COHEN, & GREEN, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* Pursuit, Reasonable suspicion, Threshold police inquiry.

A Superior Court judge improperly allowed a criminal defendant's motion to suppress evidence he discarded as he ran from a police officer, where the fact that the police officer ran after the defendant, without more, did not effect a seizure in the constitutional sense, and where the defendant was seized with reasonable suspicion when he was asked by a second officer who had seen him discard the item (a shotgun) to stop. [501-504]

INDICTMENTS found and returned in the Superior Court Department on March 13, 2002.

A pretrial motion to suppress evidence was heard by *Charles T. Spurlock*, J.

*John P. Zanini*, Assistant District Attorney, for the Commonwealth.

*Edward J. O'Brien* for the defendant.

GREEN, J. A judge of the Superior Court allowed the defendant's motion to suppress evidence discarded by the defendant as he ran from police. On the Commonwealth's appeal, we conclude that the police did not seize the defendant in the constitutional sense until after they observed the defendant throw a shotgun into the bushes, and vacate the order of suppression.

*Facts.* We summarize the facts found by the motion judge. At approximately 3:40 P.M. on January 29, 2002, Boston police Officer Lucas Taxter responded to a radio report of a fight near the Mattapan subway station. He arrived at the scene, wearing his uniform, in a marked police cruiser, and observed a group

of people arguing. As he left the cruiser to approach the group, he received a second radio report that a male wearing an "Averex" jacket might have a gun. Taxter had just seen a male wearing such a jacket heading toward Violante Road, and radioed that a person fitting the previously broadcast description was heading toward Violante Road and the tunnel under the commuter rail tracks. Taxter further advised that he would wait at the far end of the tunnel to catch the person as he emerged from the tunnel.

Two other uniformed officers, Daniel Adams and John Earley, independently heard Taxter's broadcast and responded. Earley approached the far end of the commuter rail tunnel, and Adams approached the entrance to the tunnel nearest the subway station. As Adams approached the tunnel entrance, he observed the defendant, who was not wearing an "Averex" jacket, at a distance of twenty to twenty-five feet. When the defendant saw Adams, his eyes widened, and he turned and began to run into the tunnel. Adams broadcast the defendant's description and ran after the defendant.

As the defendant emerged from the tunnel, Earley saw him run up the stairs at the tunnel's end and throw what appeared to be a shotgun over his right shoulder into the nearby bushes. Earley yelled at the defendant to stop, but the defendant continued running. Approximately ten seconds later, Adams emerged from the tunnel. Earley pursued the defendant, and Adams followed a short time later.[1] The two officers found the defendant hiding in some bushes, and found a shotgun in the bushes where Earley had seen the defendant throw one. The defendant was arrested and charged with possession of a dangerous weapon and possession of a dangerous weapon or ammunition without a firearm identification card.[2]

*Discussion.* The motion judge concluded that the police seized the defendant when Adams began running after him, and that at

---

[1] At the time the defendant emerged from the tunnel, Earley was frisking another individual. Earley instructed Adams to remain with that individual while he pursued the defendant, and Adams later enlisted a third officer to take his place so that he could join Earley in pursuit of the defendant.

[2] The grand jury indicted the defendant as an armed career criminal, based on various prior convictions.

that moment the police had no basis for suspicion of the defendant other than the fact that the defendant broke into headlong flight at the sight of Adams. Reasoning that flight alone does not provide reasonable suspicion to justify a threshold inquiry, see *Commonwealth* v. *Thibeau*, 384 Mass. 762, 764 (1981), the motion judge concluded that the seizure of the defendant was unjustified, and that the discovery of the shotgun was a result of the unjustified seizure. He accordingly allowed the motion to suppress.

"Police have seized a person in the constitutional sense 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Commonwealth* v. *Barros*, 435 Mass. 171, 173-174 (2001), quoting from *United States* v. *Mendenhall*, 446 U.S. 544, 554 (1980). "Pursuit that appears designed to effect a stop is no less intrusive than a stop itself." *Commonwealth* v. *Thibeau, supra.* See *Commonwealth* v. *Stoute*, 422 Mass. 782, 788-789 (1996). However, "[f]ollowing or observing someone without more, such as using a siren or lights, attempting to block or control an individual's path, direction, or speed, or commanding the individual to halt, is not pursuit." *Commonwealth* v. *Watson*, 430 Mass. 725, 731 (2000).

In the present case, Adams made no show of authority, or attempt to stop or restrain the defendant's movement, when he ran after him. Adams did not speak to the defendant; indeed the first words directed to the defendant came from Earley, when he yelled at the defendant to stop after seeing the defendant throw a shotgun into the bushes. The motion judge made no finding that the defendant was even aware that Adams was running behind him, and there is no evidence in the record to indicate such an awareness. Indeed, there is nothing in the motion judge's findings or the evidence to indicate that Adams was running after the defendant for any purpose other than to keep him in sight. Though flight alone does not create reasonable suspicion to justify a threshold inquiry, merely running after a running person, without more, does not effect a seizure in the constitutional sense.

Comparison of the circumstances in the present case to those in *Commonwealth* v. *Grandison*, 433 Mass. 135, 136-140

(2001), is instructive. In *Grandison*, the police followed the defendant in their cruiser down a street, reversed direction when the defendant did so, and followed the defendant into an alley where they trained bright "alley lights" on him. *Id.* at 136. Because the police did not activate their blue lights, flashers or sirens, and did not block the defendant's path, the court concluded that the officers were engaged in mere surveillance, up to the point at which they directed him to stop (after seeing the defendant spit out a package later determined to contain illegal drugs). *Id.* at 138.

The defendant suggests that Adams's radio broadcast reporting that he was running after the defendant was a show of authority. However, there is no finding, and no evidence in the record to support a finding, that the defendant was aware of Adams's radio broadcast, and the mere transmission of radio reports of the progress of surveillance activity does not transform surveillance into a seizure. *Cf. Commonwealth* v. *Watson*, 430 Mass. at 728. Similarly unavailing is the defendant's suggestion that Earley's presence at the far end of the tunnel effectively blocked the defendant's path. The motion judge's findings illustrate that the defendant's path was not blocked, that Earley was otherwise engaged at the time the defendant emerged from the tunnel, see note 1, *supra*, and that Earley made no attempt to detain the defendant until after the defendant threw the shotgun into the bushes.[3]

We conclude that the police did not seize the defendant until Earley directed the defendant to stop. Because Earley had by that time seen the defendant throw what appeared to be a

---

[3]The defendant's citation to *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. 62 (1997), to suggest that the conduct of a "mass frisk" is a show of authority is inapposite. In that case, the show of authority (and "seizure") occurred when police officers advanced on a group of youths, shouting and waving at them to stop and return to a public park from the surrounding woods. *Id.* at 74. The issue in the case was whether the information on which the police relied in effecting the stop provided reasonable suspicion to justify the stop. *Id.* at 74-75. Nothing in *Grinkley* suggests that the police actions in stopping and frisking the youths they had detained could be construed as a show of authority toward other youths in the area to whom they did not direct such a show of authority. Moreover, the judge in the present case made no finding that the police were engaged in a "mass frisk," or that the defendant believed (reasonably or otherwise) that he was required to stop for frisking at the end of the tunnel.

shotgun into the bushes, reasonable suspicion existed to justify that seizure. The order allowing the motion to suppress is reversed.

*So ordered.*