APPEALS COURT 
 
 COMMONWEALTH vs. BYRON PALMER

 
 Docket:
 24-P-365
 
 
 Dates:
 February 3, 2025 – September 19, 2025
 
 
 Present:
 All the Justices[1]
 
 
 County:
 Suffolk
 

 
 Keywords:
 Robbery. Controlled Substances. Practice, Criminal, Motion to suppress. Constitutional Law, Search and seizure. Search and Seizure, Pursuit, Reasonable suspicion.
 
 

       Indictments found and returned in the
Superior Court Department on November 23, 2021. 

      A pretrial motion to suppress evidence
was heard by Michael P. Doolin, J., a motion for reconsideration was considered
by him, and the cases were tried before James F. Lang, J.

      Craig E. Collins for the defendant.
      Henry Drembus (Ian MacLean, Assistant
District Attorney, also present) for the Commonwealth.

      HERSHFANG, J.  The defendant, Byron Palmer, was arrested
outside an apartment complex in the Jamaica Plain section of Boston after
fleeing from approaching police officers who sought to question him about an
earlier robbery and shooting in the same location.  A judge of the Superior Court denied a motion
to suppress in which the defendant maintained that the officers lacked
reasonable suspicion to question him. 
After a jury trial, the defendant was convicted of possession of cocaine
with the intent to distribute, G. L. c. 94C, § 32A (c).  On appeal, the defendant challenges only the
denial of the motion to suppress.
      Resolving this appeal requires that we
determine first the moment of seizure and then whether the police had
reasonable suspicion to seize the defendant at that moment.  See Commonwealth v. Barros, 435 Mass. 171,
173, 176 (2001).  As reflected in this
opinion and the concurring and dissenting opinions that follow, eighteen
Justices[2] are of the view that, at the latest, the defendant was seized the
moment he turned to flee and was pursued by the police -- before he began to
empty his pockets.  These eighteen
Justices join part 1 of the discussion, which is therefore a majority opinion
of the court.  Six Justices[3] are of the
view that the defendant was not seized until the police either physically
detained him or blocked his path and would affirm the motion judge's view that
the cocaine and other items were discarded before this happened.
      On the question of reasonable suspicion,
thirteen Justices[4] are of the view that, assuming that the seizure occurred
no later than when the police began to pursue the defendant, there was
reasonable suspicion to believe that he had committed a crime and, therefore,
to seize him.  Twelve of these Justices[5]
join part 2 of the discussion, which is therefore a plurality opinion.  Eleven Justices[6] are of the view that the
police did not have reasonable suspicion to seize the defendant at the time of
the seizure.  Accordingly, a majority of
the court is of the view that the motion to suppress was properly denied, and
the judgment of conviction should be affirmed.
      Background. 
We recite the facts found by the motion judge after an evidentiary
hearing on the defendant's motion to suppress, supplemented with
"uncontroverted and undisputed facts from the record that have been
credited by the motion judge." 
Commonwealth v. Privette, 491 Mass. 501, 504 (2023).
      On January 2, 2021, a cell phone
salesperson went to meet a female customer at an apartment complex in the
Jamaica Plain section of Boston.  The
salesperson was robbed of two cell phones and, when he went outside the
building to attempt to get his stolen phones back, the robber fired a gun at
him.  The victim enlisted the help of a
nearby police officer.  The victim
described the robber as a man, six feet, one inch tall, wearing black clothing
and a camouflage mask.  He further
described the robber as speaking with a southern accent.  The victim led the officer (who testified at
the hearing, and whose testimony the judge credited) to the area behind the
building where he said the shooting had occurred.  The officer found a single shell casing and
called the detective unit of the Boston police department.
      Detective Allison Eng was assigned to the
case.  (At the time of her testimony, Eng
was a sergeant, but we refer to her by the role she had at the relevant time.)  Eng also testified and was credited by the
motion judge.  Eng reached out to Boston
Housing Authority Police Sergeant Shannon O'Donnell for help in getting
interior and exterior video recordings from the time of the robbery (January 2
videos).  O'Donnell was "a police
officer inside the [apartment complex]" who was "responsible for
taking care of and monitoring the cameras throughout the [complex]."
      O'Donnell provided the January 2 videos,
which Eng watched "multiple times." 
From the time stamps on the videos and by identifying the victim and the
customer he was meeting in the exterior videos, Eng identified the suspected
robber on both interior and exterior videos. 
Eng described the suspect as "fitting the description
. . . [d]ark clothing, hood up," seen entering the building
"directly before" he was seen on the interior videos.  After some minutes passed, the victim and the
customer entered the building.  The
customer was carrying a large, brown, "Louis Vuitton"-type shoulder
bag.  Approximately three minutes later,
the suspect ran from the building, "carrying what look[ed] to be the large
purse that the woman with the victim . . . was originally
carrying."  The customer followed
within a second, without her purse.
      From watching the suspect on the interior
videos, Eng derived a "[p]retty good clothing description, and a general
subject description.  He was wearing a
face mask at the time, but he had some pretty distinct features in addition to
the clothing."  He wore a
"pretty distinct coat," a "heavy black jacket on the bottom,
kind of two-toned gray on the top"; the suspect's shoes were
"distinct sneakers" with "a metallic kind of reflective
. . . kind of tape going around them."  Eng described the suspect as having a
"long dreadlock" hairstyle and being "dark skin
complected."  The suspect's hat
"was a black and white checker hat with a large round logo on the front
and a metallic tag, I guess on the brim of the hat that comes when you purchase
the hat."  O'Donnell told Eng that
she "ha[d] a pretty good knowledge of the residents" and "was
surprised that she . . . didn't recognize the suspect."
      On January 6, four days after the robbery,
O'Donnell reached out to another detective because she had reviewed video
footage from the day after the robbery (January 3 video) and seen someone who
"fit the description of the suspect from the incident."  That detective forwarded a still image from
the video to Detective Eng with the notation, "this is guy who did robbery
has jacket and sneakers on next day," adding, "[S]hannon [O'Donnell]
says [this] is the guy.  I don't know
what her basis is."  In addition to
viewing this still image, Eng watched the January 3 video, which showed "a
person fitting the same description of the suspect in the . . . same
hallway" without a face mask.  From
viewing the still image, Eng believed it was the same person because the person
in the hallway on January 3 was wearing the same jacket and sneakers that the
suspected robber had worn on January 2 and had "the same hairstyle, same
complexion" and "fit the genera[l] size" of the suspect.
      On the morning of January 14, twelve days
after the robbery, O'Donnell placed a telephone call to another detective to
say she was "watching the videos in real time" and saw "this
suspect who we believed to be the person responsible for the robbery" at
the apartment complex.[7]  O'Donnell also
sent a "still shot" from that video footage depicting the suspect,
noting, "Your guy is back." 
The motion judge found that O'Donnell "observed the same suspect in
the parking lot."
      Eng spoke to O'Donnell by telephone.  O'Donnell "was watching the cameras and
observed the suspect to be out in the parking lot."  O'Donnell identified the person on the live
video feed as "the person who was involved in the robbery."  "Based on the conversation [she] had
with [Sergeant] O'Donnell" and because, in the still image from the video
footage Eng could "clearly see . . . the hat and the hairstyle
of the suspect," Eng believed that she had "[r]easonable suspicion to
respond and attempt to identify that individual."  She and two other plainclothes detectives
went to the apartment complex.  Because
the robbery had involved a firearm, Eng also "had an additional unit
respond," consisting of four armed, uniformed officers.  Those officers, including Officer Alex Rosa,
arrived in a police wagon, which they parked in the parking lot.  The detectives explained that they wanted to
question the suspect and asked the uniformed officers to stand by "just in
case if he tried to flee."
      Eng and the two other detectives approached
the defendant in the parking lot.  The
four uniformed officers approached from another direction, "not directly
with" the detectives, but within the detectives' view.  When Eng saw the defendant in the parking lot,
she "believed [him] to be the person responsible for the
robbery."  One of the detectives
called out to the defendant to get his attention.  Eng testified that the detectives were
"just trying to make casual conversation" and "just trying to
get his name and information based on . . . him possibly being a
suspect from the robbery."
      The defendant immediately started to run
away across the parking lot.  Rosa and
the other uniformed officers immediately ran after him.  As Rosa gave chase, the defendant "tossed
items out of his pocket."  Rosa saw
"individual monetary bills that were swirling in the air."  Eng saw the defendant discarding plastic bags
of what she believed to be drugs.  The
defendant stopped running after a few seconds, put his hands up, and was
quickly arrested.  The police recovered
money and drugs from the ground where the defendant had been running.
      The motion judge denied the defendant's
motion to suppress.  Prior to trial, the
Commonwealth nol prossed an indictment for armed robbery.  The defendant was tried before a different
judge and jury in the Superior Court on charges of attempted assault and
battery by means of a firearm, carrying a loaded firearm, unlawful possession
of a firearm and ammunition, and possession of cocaine with the intent to
distribute.  The jury acquitted the
defendant of all charges except the drug charge.
      Discussion.  The defendant maintains that his motion to
suppress should have been allowed because he was seized the moment the officers
approached him and, at that point in time, the officers lacked reasonable
suspicion to justify an investigative stop. 
The Commonwealth maintains that no stop occurred until the police
apprehended the defendant, after the pursuit. 
The motion judge agreed with the Commonwealth and opined that the
defendant's flight, coupled with "the combination of all the other
evidence . . . identifying the defendant with distinctive details and
demonstrating his criminality was sufficient to establish reasonable suspicion."  Ultimately, however, the judge's
determination of reasonable suspicion was irrelevant because he concluded that
the money and drugs discarded by the defendant "were abandoned and
therefore their subsequent recovery by the police did not constitute a
search."
      "When reviewing the disposition of a
motion to suppress, we accept the motion judge's subsidiary findings absent
clear error, and 'make an independent determination whether the judge properly
applied constitutional principles to the facts as found.'"  Commonwealth v. Robinson-Van Rader, 492 Mass.
1, 9 (2023), quoting Commonwealth v. Lyles, 453 Mass. 811, 814 (2009).
      Article 14 of the Massachusetts
Declaration of Rights provides that "[e]very subject has a right to be
secure from all unreasonable searches, and seizures, of his person, his houses,
his papers, and all his possessions." 
An investigatory stop or "seizure" by police is justified
under art. 14 if the police have reasonable suspicion to believe at the time of
the stop "that the person has committed, is committing, or is about to
commit a crime."  Robinson-Van
Rader, 492 Mass. at 8, quoting Commonwealth v. Costa, 448 Mass. 510, 514
(2007).  Thus, we must determine when the
stop occurred before determining whether the police had reasonable suspicion
for the stop.  See Barros, 435 Mass. at
173 (determining precise moment of seizure "critical" to resolving
motion to suppress).  The timing of the
stop is critical here because if the defendant dropped the drugs on the ground
after an unjustified stop, the drugs would be the fruit of an unconstitutional
seizure under art. 14.  See Commonwealth
v. Rodriguez, 456 Mass. 578, 587 (2010), and cases cited therein.  But "[i]f he dropped the drugs before he
was stopped, then the drugs could not be the fruit of the seizure."  Id. 
      1. 
When did the stop occur? 
"[N]ot every encounter between a law enforcement official and a
member of the public constitutes [a seizure]."  Commonwealth v. Franklin, 456 Mass. 818, 820
(2010), quoting Commonwealth v. Lopez, 451 Mass. 608, 611 (2008).  To decide whether a person has been
"seized" in the constitutional sense, "we look at the totality
of the circumstances to determine whether a member of law enforcement has
'engaged in some show of authority' that a reasonable person would consider
coercive; that is, behavior 'which could be expected to command compliance,
beyond simply identifying [himself or herself] as police.'"  Commonwealth v. Matta, 483 Mass. 357, 362
(2019), quoting Commonwealth v. Sanchez, 403 Mass. 640, 644 (1988).  "[T]he inquiry must be whether, in the
circumstances, a reasonable person would believe that an officer would compel
him or her to stay."  Matta, supra
at 363.
      In the absence of intimidating
circumstances, when a police officer approaches someone and attempts to get the
person's attention, asks to speak with the person, or engages in casual
conversation, the interaction is not a seizure in the constitutional
sense.  See Lopez, 451 Mass. at 610-614
(collecting cases in which circumstances of police officers approaching
suspects and asking questions held not to be sufficiently intimidating that
reasonable person in suspect's position would have felt compelled to stop and
speak with officers).  However, the
"threatening presence of several officers" may amount to a show of
authority inconsistent with casual conversation.  United States v. Mendenhall, 446 U.S. 544,
554 (1980) (opinion of Stewart, J.).  See
Commonwealth v. Pimentel, 27 Mass. App. Ct. 557, 560 (1989).  For example, in Commonwealth v. Grinkley, 44
Mass. App. Ct. 62, 74 (1997), we held that "several police officers' show
of authority in advancing on [a group of youths], shouting and waving at them
to stop" effected a seizure.  In
Pimentel, supra at 561, we observed that "the number of officers involved
in an encounter could be great enough that their mere presence might reasonably
be viewed as threatening," but we did not think that the presence of three
officers in that case was "impressive or overwhelming."  By contrast, in Commonwealth v. Depina, 456
Mass. 238, 242 (2010), three armed officers wearing "Gang Unit"
shirts converging on the defendant and saying "come over here" was
held to constitute a seizure.  
      Because the defendant did not discard the
drugs until after he began to run and was immediately pursued, we need not
decide whether the circumstances before that moment -- the approach of three
plainclothes officers wearing visible badges and asking to speak to the
defendant, while four armed, uniformed police officers approached from another
direction, with a police wagon parked nearby -- could reasonably be viewed as a
sufficiently intimidating show of authority that a reasonable person in the
defendant's position would have believed that the officers intended to use
their police power to compel him to stay and answer their questions.  It became apparent the moment the defendant
turned to flee and several officers immediately chased after him that he would
be compelled to stay.  "Pursuit that
appears designed to effect a stop is no less intrusive than a stop
itself. . . .  [A] stop
starts when pursuit begins." 
Barros, 435 Mass. at 175, quoting Commonwealth v. Thibeau, 384 Mass.
762, 764 (1981).  See Commonwealth v.
Stoute, 422 Mass. 782, 789 (1996) (holding that under art. 14 "a pursuit,
which, objectively considered, indicates to a person that he would not be free
to leave the area . . . without first responding to a police
officer's inquiry, is the functional equivalent of a seizure").
      This is not a case in which the police
merely followed the defendant to maintain visual surveillance.  See Franklin, 456 Mass. at 822-823, and cases
cited therein.  The officers were already
approaching the defendant on foot, and their immediate pursuit of the defendant
after he started to flee -- which he was free to do if their approach was truly
an overture for a consensual encounter, see Commonwealth v. Warren, 475 Mass.
530, 538-539 (2016) -‑ would have made it clear to the defendant, if it was not
already, that the officers intended to prevent him from leaving the parking
lot.  Contrast Franklin, supra at 823 (no
seizure where defendant began running before officers got out of their vehicle
and ran after him, with no evidence that they "exercised any show of
authority" or "block[ed] or impede[d] his path").  The fact that he immediately surrendered
himself seconds later, after his ineffectual attempt to distance himself from
evidence of drug dealing, further demonstrates that he felt compelled to stay
and answer questions.  See Grinkley, 44
Mass. App. Ct. at 74 (youths' submission to officers' show of authority
supported conclusion that no reasonable person would have felt free to
leave).  Thus, at the latest, the
defendant was seized the moment he turned to flee and was pursued -- before he
began to empty his pockets.
      2. 
Did the police have reasonable suspicion to believe that the defendant
committed the robbery?  We next ask
whether, at the time of the seizure, the officers "had reasonable
suspicion to believe that the defendant was committing, had committed, or was
about to commit a crime" (quotation omitted).  Matta, 483 Mass. at 365, quoting Commonwealth
v. Martin, 467 Mass. 291, 303 (2014). 
"Reasonable suspicion must be based on specific and articulable
facts and reasonable inferences therefrom, in light of the officer's
experience" (quotation and citation omitted).  Robinson-Van Rader, 492 Mass. at 8.  "The facts and inferences underlying the
officer's suspicion must be viewed as a whole when assessing the reasonableness
of his [or her] acts."  Matta, supra,
quoting Commonwealth v. Sykes, 449 Mass. 308, 314 (2007).  "Reasonable suspicion requires less than
probable cause to arrest but must be based on more than just a
hunch."  Commonwealth v. Henley, 488
Mass. 95, 102 (2021).  
      In making this assessment, we trace the
line from the robbery to the moment of the defendant's seizure, asking
"whether, when viewed objectively, there were specific articulable facts
and inferences that linked the defendant back to the point of origin of the
commission of the crime[]" twelve days earlier.  Commonwealth v. Doocey, 56 Mass. App. Ct.
550, 554 (2002).[8] 
      The victim described the robbery suspect
by his height, dark clothing, face mask, and southern accent.  Based on this initial description, combined
with the time stamps on the January 2 videos and the people and interactions
depicted in them, including the flight of the robbery suspect with what
appeared to be the customer's brown bag, the officers identified the masked
robbery suspect in those videos.  That
is, from this point on, they knew the person they were looking for was the man
in the January 2 videos, although they did not know his name.  From the videos the officers observed
additional details about the suspect's appearance -- dark skin, dreadlocks, a
black and white checkered hat with a logo on the front, and distinctive jacket
and shoes.  Thus, after O'Donnell and Eng
reviewed the January 2 videos, they had identified the robbery suspect, as the
motion judge correctly concluded.
      The January 3 video from the apartment
complex showed "the same suspect," as the motion judge found,
including the man's bare face.  O'Donnell
reviewed the January 3 video and recognized the suspect, seen in a hall with
other young adults as the "guy who did [the] robbery," noting in a
message to Eng that the suspect was wearing the same distinctive jacket and
sneakers as during the robbery.  While
the January 3 video was not admitted at the suppression hearing, Eng watched
it.  Also, from the still image sent by
O'Donnell, Eng recognized the robbery suspect seen in the prior day's videos,
noting that he was wearing the same jacket and sneakers on January 3 that he
had worn on January 2 and had the same hairstyle, complexion, and general
size.  While the timing is not
"close" as in Warren or Robinson-Van Rader, the robbery suspect's
appearance in the same location, one day after the robbery, adds to the
reasonable suspicion calculus.  See
Robinson-Van Rader, 492 Mass. at 13; Warren, 475 Mass. at 536.  Equally -- or perhaps more -- importantly,
the January 3 video afforded O'Donnell and Eng another opportunity to observe
the suspect, this time with a bare face, adding to their knowledge of what he
looked like.  See Commonwealth v. Odware,
429 Mass. 231, 236 (1999) (identification more reliable where witness "saw
the defendant multiple times").
      This brings us to the day of the arrest,
January 14.  By the day of the arrest,
Eng and O'Donnell had seen multiple images, both still and video, of the
suspect.  They were not attempting to
identify someone from a description alone. 
See Commonwealth v. Charley, 91 Mass. App. Ct. 223, 227 (2017)
(reasonable suspicion calculus included officer's observation of suspect in
person and on surveillance video footage). 
Cf. Depina, 456 Mass. at 243 ("When police officers on the street
stop a defendant in reliance on a police dispatch alone . . ."
[emphasis added]).  They were looking for
a person whom they had observed and studied at length on video recordings.  O'Donnell was monitoring a live video feed and
again saw the robbery suspect.  When she
saw him, she called the Boston police detectives and sent a text message
saying, "Your guy is back," to which she attached an image of the
suspect.  The image, combined with
O'Donnell's identification, was "particular enough to support
. . . reasonable suspicion that the defendant had committed a
crime."  Henley, 488 Mass. at
103.  Eng went to the apartment complex
"[b]ased on the conversation [she] had with Officer O'Donnell and you can
clearly see in that still photo the hat and the hairstyle of the suspect.  And . . . it was the same
location . . . ." 
This evidence supported the motion judge's findings that on the day of
the arrest O'Donnell "observed the [robbery] suspect in the parking
lot," and the defendant "had the same hat, complexion and hair
style" as the suspect.
      "'In reviewing a ruling on a motion
to suppress evidence, we accept the judge's subsidiary findings of fact absent
clear error,' and we defer to the judge's determination of the weight and credibility
to be given to oral testimony presented at a motion hearing."  Commonwealth v. Hoose, 467 Mass. 395, 399
(2014), quoting Commonwealth v. Contos, 435 Mass. 19, 32 (2001).  Given the motion judge's finding that
O'Donnell observed the same suspect on the day of the arrest whom she had seen
on two earlier occasions while investigating the robbery, O'Donnell had
reasonable suspicion to approach and stop the defendant.  Therefore, the Boston police officers working
with her were permitted to do the same. 
See Privette, 491 Mass. at 514-516. 

      We would reach the same conclusion if we
considered what O'Donnell said to Eng using the framework applied to tips.  We would consider whether "the
information on which the dispatch was based had sufficient indicia of
reliability," and whether "the description of the suspect conveyed by
the dispatch had sufficient particularity that it was reasonable for the police
to suspect a person matching that description."  Depina, 456 Mass. at 243.  "Where, as here, the required standard
is reasonable suspicion rather than probable cause 'a less rigorous showing in
each of these areas is permissible.'" 
Commonwealth v. Westgate, 101 Mass. App. Ct. 548, 551 (2022), quoting
Commonwealth v. Lopes, 455 Mass. 147, 156 (2009).  
      "Particularity" is addressed
above.  Evaluating indicia of reliability
involves considering "the basis of knowledge of the source of the
information" and "the underlying circumstances demonstrating that the
source of the information was credible or the information reliable"
(citation omitted).  Westgate, 101 Mass.
App. Ct. at 551.  "Information
related by a reliable person can be sufficient to establish a reasonable suspicion."  Commonwealth v. Wren, 391 Mass. 705, 707
(1984).  
      The basis of O'Donnell's knowledge was her
prior review of the video footage and prior identifications of the
defendant.  She knew who she was looking
for.  As a fellow law enforcement officer
working in conjunction with Eng, her veracity was not in question.[9]  Eng knew that O'Donnell's "knowledge was
based on personal observation, and [she] had reason to trust [her]
veracity."  Wren, 391 Mass. at
707.  And, importantly, when Eng saw the
defendant in the parking lot, she identified him as the robbery suspect.
      To the extent Eng also believed the
defendant was the robbery suspect because the description (the defendant's
size, hat, complexion, and hairstyle) matched the suspect she had observed in
the video footage and still photographs, that corroborated the identification.  This evidence amply supported the motion
judge's findings that on the day of the arrest O'Donnell "observed the
[robbery] suspect in the parking lot," and the defendant "had the
same hat, complexion and hair style" as the suspect.  
      Finally, the fact that the defendant took
off running when approached by detectives adds to the reasonable suspicion
calculus.  See, e.g., Stoute, 422 Mass.
at 791; Commonwealth v. Mercado, 422 Mass. 367, 368, 371 (1996).  While there are many legitimate reasons a
person may choose not to engage with police, we need not completely ignore the
defendant's sudden flight in the face of police inquiry.  See Wren, 391 Mass. at 708 n.2.  Because it "would have been poor police
work indeed" for the officers not to investigate further after O'Donnell
reported that the robbery suspect was "back," Terry v. Ohio, 392 U.S.
1, 23 (1968), and because there was reasonable suspicion to believe the
defendant was the robbery suspect, we affirm.
Judgment
affirmed.

      DITKOFF, J. (concurring, with whom Meade,
Neyman, Singh, Englander, and Hodgens, JJ., join).  I concur because it is settled law that
police officers do not seize a running defendant merely by running after that
defendant.[1]  One does not need police
authority to follow someone, even someone who is running.  Instead, a seizure occurs when pursuit is
accompanied by a command to stop or by other actions communicating the use of
police authority to require the defendant to stop.
      Under art. 14 of the Massachusetts
Declaration of Rights,[2] a seizure occurs when "an officer has, through
words or conduct, objectively communicated that the officer would use his or
her police power to coerce that person to stay."  Commonwealth v. Matta, 483 Mass. 357, 362
(2019).  Usually this is accomplished through
the classic, "Stop, police" in conjunction with a chase.  See id. at 365 ("The defendant was
seized . . . once the officer ordered him to stop, and then chased
him"); Commonwealth v. Jones-Pannell, 472 Mass. 429, 433 (2015) (seizure
at "loud command to '[w]ait,'" followed by pursuit); Commonwealth v.
Quezada, 67 Mass. App. Ct. 693, 696 (2006), S.C., 450 Mass. 1030 (2008)
("a seizure occurred when [the officer] chased the defendant and yelled
'stop'"); Commonwealth v. Dasilva, 66 Mass. App. Ct. 556, 558 n.4 (2006)
("the defendant was seized when [the officer] first began pursuing him and
ordered him to stop").
      Both we and the Supreme Judicial Court
have rejected the notion that pursuit without a command to stop constitutes a
seizure.  In Commonwealth v. Franklin,
456 Mass. 818, 819 (2010), the defendant ran when he saw the police vehicle
approaching.  As soon as the defendant
started running, "three of the officers got out of the car, with two of
them running after the defendant." 
Id.  In the absence of a command
to stop, running after the defendant was not a seizure.  See id. at 823 ("the [motion] judge's
conclusion that the defendant was seized when the police left their vehicle and
began to run after him was incorrect"). 
Rather, the moment of seizure was when "the police grabbed the
defendant as he was climbing the fence." 
Id.
      Similarly, in Commonwealth v. Powell, 459
Mass. 572, 575 (2011), cert. denied, 565 U.S. 1262 (2012), the defendant began
running after the officers drove "very slowly" down the street with
the windows down.  The defendant ran, and
an officer alighted from his vehicle and followed the running defendant.  Id. at 575-576.  The Supreme Judicial Court held that this was
not a seizure.  See id. at 578.  As the court explained, "[w]hen [the
officer] began following the defendant on foot, he had not exercised any show
of authority or commanded the defendant to stop; and the officers had not
blocked or impeded the defendant's path." 
Id.  Rather, the moment of seizure
occurred when the officer drew his weapon and instructed the defendant to drop
his weapon.  Id.  Accord Commonwealth v. Isaiah I., 450
Mass. 818, 820, 822 (2008) (no seizure where juvenile "'quickly' walked
into the store" and officer "'quickly' followed the juvenile down an
aisle").
      Our case law is in accord.[3]  As we have stated, "merely running after
a running person, without more, does not effect a seizure in the constitutional
sense."  Commonwealth v.
Shane S., 92 Mass. App. Ct. 314, 321 (2017), quoting Commonwealth v.
Perry, 62 Mass. App. Ct. 500, 502 (2004). 
In Shane S., supra at 316, an officer said to the juvenile and his
companion, "Hey, guys, can I talk to you for a sec?"  When the officer asked the companion his name
and began to take out his cell phone, the juvenile ran, and the officer ran
after him.  Id.  We held that the officer did not seize the
juvenile as "[t]here is no evidence in the record that [the officer]
called out to the juvenile to stop" or that "the juvenile looked back
at [the officer]."  Id. at 318, 319.
      In Perry, 62 Mass. App. Ct. at 501, the
defendant ran away after seeing the officer, and the officer "broadcast
the defendant's description and ran after the defendant."  We rejected the motion judge's conclusion
that this constituted a seizure.  Id. at
503.  As we explained, the officer
"made no show of authority, or attempt to stop or restrain the defendant's
movement, when he ran after him." 
Id. at 502.  Accordingly,
"[w]e conclude[d] that the police did not seize the defendant until [the officer]
directed the defendant to stop." 
Id. at 503.
      Here, there was no evidence that any
officer told the defendant to stop.  To
the contrary, Detective Allison Eng testified, "We did not demand he
stop" and that no officer at any point told him to stop.  "The motion judge made no finding that
the defendant was even aware that [the officer] was running behind him, and
there is no evidence in the record to indicate such an awareness."  Perry, 62 Mass. App. Ct. at 502.  In short, nothing justifies the conclusion
that the officers seized the defendant merely by running after him.
      To be sure, a seizure occurred at some
point.  The officers eventually
physically detained the defendant, and the body camera footage reveals that the
uniformed officers at some point blocked the defendant's path.  Compare Commonwealth v. Edwards, 476 Mass.
341, 345 (2017) (seizure occurs when police vehicle blocks defendant's
vehicle's egress), with Commonwealth v. Karen K., 491 Mass. 165, 174 n.5
(2023) (not deciding whether seizure occurred when officer on foot blocked
juvenile's path).
      The motion judge appeared to find that the
defendant discarded the drugs and money before he was seized, and the testimony
of the officers supported such a finding. 
Detective Eng testified that "[i]mmediately upon fleeing on foot he
began discarding drugs from his pockets," and one of the uniformed
officers testified that "[w]hat caught my eye was like individual monetary
bills that were swirling in the air." 
Although one could view the body camera footage as suggesting that the
defendant discarded the money after the uniformed officers moved to block his
path, that footage is inconclusive and is not enough to establish clear error
in the motion judge's findings.  See
Karen K., 491 Mass. at 170, quoting Commonwealth v. Carr, 458 Mass. 295,
303 (2010) ("Where there are two permissible views of the evidence,
[however,] the factfinder's choice between them cannot be clearly
erroneous").
      Because the defendant discarded the drugs
before being seized, there is no basis for suppressing the drugs.  See Commonwealth v. Lopez, 451 Mass. 608, 614
(2008).  Moreover, once the defendant
discarded drugs in plain view of the police officers, they unquestionably had
reasonable suspicion to seize him.  See
Commonwealth v. Evans, 87 Mass. App. Ct. 687, 689 (2015).  Accord Franklin, 456 Mass. at 823; Perry, 62
Mass. App. Ct. at 503-504.  Accordingly,
the motion judge properly denied the motion to suppress.
      I respectfully concur in affirming the
judgment.

      MASSING, J. (dissenting in part, with whom
Rubin, Henry, Desmond, Sacks, Shin, D'Angelo, Smyth, Toone, Tan, and Wood, JJ.,
join).  When a defendant files a motion
to suppress alleging that the police unconstitutionally exercised their
coercive powers to detain him for the purposes of investigating a crime, it is
critical not only for the public's confidence in the legitimacy of law
enforcement, but also for the integrity of our criminal justice system, that
prosecutors and the police come to court prepared to supply evidence of the
specific, articulable facts that the police possessed and relied on to justify
the seizure.  "We do not blindly
accept officers' reliance on information obtained through police channels; the
government must substantiate the basis of the information."  United States v. Alvarez, 40 F.4th 339, 352
(5th Cir. 2022).  The evidence adduced at
the suppression hearing showed that the police stopped the defendant based on
nothing more than his skin color, hairstyle, and hat -- descriptive features
that could fit any number of young men in the area where the stop occurred and
did not rise to the level of reasonable suspicion that the defendant was the
same man seen on video surveillance footage almost two weeks before.  Because the Commonwealth failed to produce
evidence demonstrating that the officers' decision was based on anything more,
and because in my view the majority draws unwarranted inferences to compensate
for this absence of proof, I respectfully dissent from part 2 of the plurality's
opinion.
      As we must accept the motion judge's
subsidiary findings of fact, unless clearly erroneous, and then "make an
independent determination whether the judge properly applied constitutional
principles to the facts as found," Commonwealth v. Robinson-Van Rader, 492
Mass. 1, 9 (2023), quoting Commonwealth v. Lyles, 453 Mass. 811, 814 (2009), I
begin with the motion judge's brief written findings.
      On January 2, 2021, after the victim
"described his assailant as a man, 6'1" tall, wearing black clothing,
a camouflage mask and who spoke with a southern accent," Boston Police
Detective Allison Eng and Boston Housing Authority Police Sergeant Shannon
O'Donnell reviewed surveillance footage from the Mildred C. Hailey Apartment
complex[1] and determined "that the suspect was a dark-skinned male with
dreadlocks, a coat, sneakers, and a hat with a logo on the front."  On surveillance footage from the next day,
January 3, "the same suspect was seen without a mask and was wearing a
distinctive chain around his neck." 
On January 14, O'Donnell "observed the same suspect in the parking
lot" while monitoring the live feed from the apartment complex's
surveillance cameras.  When Eng arrived
on the scene, she saw the defendant. 
"Eng believed that this individual was the suspect from the robbery
and surveillance footage."  He
"had the same hat, complexion and hairstyle as the suspect observed
earlier."
      Because O'Donnell did not testify at the
hearing on the motion to suppress, the finding that O'Donnell "observed
the same suspect in the parking lot" was based on Eng's testimony and one
exhibit -- a text message that O'Donnell sent to Eng stating, "Your guy is
back," along with a still image from the surveillance cameras.  Eng testified that she decided to return to
the apartment complex to investigate "[b]ased on the conversation [she]
had with Officer O'Donnell and you can clearly see in that still photo the hat
and the hairstyle of the suspect." 
Nowhere in her testimony did Eng describe O'Donnell's basis for her
belief that the defendant in the parking lot was the suspect from the January 2
and 3 video footage.  Nor did the motion
judge make any findings concerning the basis of O'Donnell's belief -- he merely
repeated Eng's testimony that O'Donnell told Eng that she "observed the
same suspect."  And the judge made
no finding that the defendant's hat and hairstyle were "clearly
visible," or visible at all, in the still image from the video footage.  Such a finding would have been clearly
erroneous.  See Commonwealth v. Yusuf,
488 Mass. 379, 385 (2021) (appellate court in same position as motion judge to
review documentary evidence such as video recording).
      According to the motion judge's findings,
Eng decided to stop and question the defendant based on his "hat,
complexion and hairstyle" -- and O'Donnell's word.  The defendant was not wearing the same coat
or sneakers that the suspect had been wearing on January 2 and 3.  The officers did not see the distinctive
chain from January 3, nor did they hear a southern accent.  Eng did not testify, and the judge did not
find, that she recognized the defendant based on the suspect's facial features
that she had observed while studying the January 2 video footage (in which, of
course, the suspect was masked) or from viewing the January 3 footage.  Although Eng made a brief, vague reference to
the defendant's "size" during her testimony, she did not state, nor
did the judge find, that the defendant's height, weight, or build were similar
to that of the suspect.  The judge
concluded that reasonable suspicion was established based on the defendant's
flight in combination with "all the other evidence set forth above
identifying the defendant with distinctive details," but it is our duty to
make an independent determination whether these details were sufficiently
distinctive to satisfy the constitutional standard.
      The constitutional issues here are
"whether, when viewed objectively, there were specific articulable facts
and inferences that linked the defendant back to the point of origin of the
commission of the crimes" twelve days earlier, Commonwealth v. Doocey, 56
Mass. App. Ct. 550, 554 (2002), and whether the description of the suspect
"had sufficient particularity that it was reasonable for the police to
suspect a person matching that description," Commonwealth v. Depina, 456
Mass. 238, 243 (2010).  "To make an
investigatory stop based solely on a physical description, the description need
not be so particularized as to fit only a single person, but it cannot be so
general that it would include a large number of people in the area where the
stop occurs."  Id. at 245-246.  See Commonwealth v. Privette, 491 Mass. 501,
519 (2023) ("We have cautioned that a match between a defendant's
appearance and a general description alone does not amount to reasonable
suspicion, particularly if that general description could fit a large number of
people in the area where the stop occurred").  A description of a Black male wearing dark
clothing and a red "hoodie" (hooded sweatshirt) in the Roxbury neighborhood
of Boston is not sufficient.  See
Commonwealth v. Warren, 475 Mass. 530, 535-536 (2016).  Nor is a description of "a young Black
man in a black hooded sweatshirt and blue jeans."  Commonwealth v. D.M., 100 Mass. App. Ct. 211,
216 (2021).  Likewise, "the
description of the suspect as a 'black male with a black 3/4 length goose[-down
jacket]'" was insufficient to provide reasonable suspicion because it
"could have fit a large number of men who reside in the Grove Hall section
of Roxbury, a predominantly black neighborhood of the city."  Commonwealth v. Cheek, 413 Mass. 492, 496
(1992).
      The description of the suspect in this
case as "a dark-skinned male" did not distinguish him from many Black
men, or dark-skinned Latino men for that matter, who might be found in the
neighborhood of the Hailey apartment complex in the Jamaica Plain section of
Boston.[2]  The suspect's hairstyle,
which Eng described as "long dreadlock" based on the January 2
surveillance footage, likewise was not a distinguishing characteristic.  See Commonwealth v. Davis, 487 Mass. 448, 469
(2021), S.C., 491 Mass. 1011 (2023) ("All one can see is that the shooter
is a Black man with long hair in braids or dreadlocks that extend down to his
midback.  As amici point out, braided
hairstyles are not uncommon among Black people" [footnote omitted]).[3]  And while a suspect's hat might be helpful to
identify him in a showup identification procedure conducted promptly after a
crime, see Commonwealth v. Meas, 467 Mass. 434, 443, cert. denied, 574 U.S. 858
(2014), the police could not reasonably identify the generally described
robbery suspect, twelve days later, by his black and white checkered baseball
hat with an unidentified logo and metallic tag.[4]  Hats "are easily worn, taken off,
changed, or discarded."  Privette,
491 Mass. at 520.  Indeed, the suspect as
seen on the surveillance footage on January 2 was wearing a different hat from
the suspect as seen on the January 3 footage.
      As to the fact that the defendant fled
immediately after seven police officers converged on him,[5] it was not a
reasonable inference that he fled because he thought the officers suspected him
of the robbery and shooting incident twelve days earlier.  In other words, his flight did not
demonstrate consciousness of guilt related to the suspected crime and,
therefore, did not contribute to the officers' reasonable suspicion that the
defendant had committed that crime. 
"[E]vasive conduct in the absence of any other information tending
toward an individualized suspicion that the defendant was involved in the crime
is insufficient to support reasonable suspicion."  Warren, 475 Mass. at 538.  See id. at 539-540 (given documented pattern
that Black men in Boston are disproportionately subjects of police-civilian
encounters, evidence of flight carries diminished probative value).
      As discussed above, Eng's testimony did
not suggest that she recognized the defendant in the parking lot based on
features of the suspect she had observed in the surveillance video footage,
other than the hat, hairstyle, and skin color. 
Which brings us to Eng's reliance on O'Donnell's belief that the
defendant, observed by O'Donnell while watching live surveillance feed, was the
same person as the suspect.  Because
O'Donnell did not testify, and Eng's testimony relayed only O'Donnell's belief,
but not the basis for that belief, the record is devoid of evidence supporting
O'Donnell's representation to Eng that she observed "the same
suspect" in the parking lot. 
Although the collective knowledge doctrine was not raised at the
suppression hearing or in the parties' briefs on appeal, I do not doubt that
Eng and O'Donnell's working relationship was sufficient to establish
"horizontal collective knowledge," such that O'Donnell's knowledge
can be aggregated with Eng's for the purpose of determining reasonable
suspicion.  See Privette, 491 Mass. at
513-514.  The collective knowledge
doctrine, however, does not relieve the Commonwealth of its burden to produce
evidence of the specific, articulable facts known to O'Donnell that could be
added to Eng's knowledge.  For example,
in Privette, the court concluded that the knowledge of one officer involved in
an armed robbery investigation could be imputed to the arresting officer, but
in defending the motion to suppress, both officers testified.  See id. at 504, 518-519.  Likewise, an officer from one police
department may stop a named suspect based on a bulletin issued by another
department, but to defend the stop in a suppression hearing, the government
must present evidence of the specific and articulable facts underlying the
bulletin that provided reasonable suspicion to stop the suspect.  See United States v. Hensley, 469 U.S. 221,
232-235 (1985).  See also Cheek, 413
Mass. at 494-495 ("Where the police rely on a police radio call to conduct
an investigatory stop, under both Federal and State law, the Commonwealth must
present evidence at the hearing on the motion to suppress on the factual basis
for the police radio call in order to establish its indicia of reliability").
      It was the Commonwealth's responsibility
to substantiate the basis for stopping the defendant; it is not the
responsibility of an appellate court to compensate the deficiencies in the
Commonwealth's proof.  In my view, the
plurality errs by accepting Eng's reliance on O'Donnell's conclusion that the
defendant was the same person as the suspect she viewed on the video footage,
without any evidence of the specific, articulable factors that led O'Donnell to
that conclusion.  "A court may not
simply rely on a police officer's conclusory assertions in deciding whether a
search or seizure was justified under the Fourth Amendment, but rather must
evaluate the facts underlying those assertions" (citation omitted).  Milline v. United States, 856 A.2d 616, 619
(D.C. 2004).  "[T]o do so the
[court] must be 'apprised of sufficient facts to enable [it] to evaluate the
nature and reliability of that information.'"  Id., quoting In re T.L.L., 729 A.2d 334, 341
(D.C. 1999).  While it may have been
"poor police work indeed" for Eng not to follow up on O'Donnell's
lead, see ante at        , without evidence
of the facts underlying that lead, we are left with a seizure based only on
skin color, a common hairstyle, and a hat. 
      For the sake of completeness, other
factors that sometimes figure into the reasonable suspicion calculus, such as
"temporal and physical proximity," Privette, 491 Mass. at 519, can be
ruled out.  "Proximity is accorded
greater probative value in the reasonable suspicion calculus when the distance
is short and the timing is close." 
Warren, 475 Mass. at 536.  Thus,
where a defendant was found in the reported path of flight from the robbery
scene seven minutes after the robbery was reported, "the timing and the
location of the stop in relation to the armed robbery . . . weigh[ed]
in favor of a finding of reasonable suspicion."  Privette, supra at 520.  Accord Doocey, 56 Mass. App. Ct. at 558
(general description enhanced by defendant's close physical proximity to crime
scene, within moments of shots having been fired, where "defendant was the
only person present in the very narrow zone where the suspect was seen headed
and would probably be found"). 
Here, although the defendant was present near the crime scene, his
presence did not contribute to reasonable suspicion that he had committed a
crime twelve days earlier. 
      Finally, as to "[t]he gravity of the
crime and the present danger of the circumstances," Depina, 456 Mass. at
247, although the police were investigating a robbery and the discharge of a
gun, nothing in the circumstances of the gathering in the parking lot twelve
days later suggested that a potentially violent crime was in progress, that the
defendant was armed, or that any other threat of danger to the community was
afoot.  Compare Doocey, 56 Mass. App. Ct.
at 557 (where possession of gun "presents an imminent threat because of
shots just fired, or likely to be fired . . . there is an edge added
to the [reasonable suspicion] calculus"), with D.M., 100 Mass. App. Ct. at
218-219 (reasonable suspicion not enhanced where defendant's conduct did not
suggest he was concealing gun).
      Because the Commonwealth failed to
demonstrate that the police had reasonable suspicion to stop the defendant, the
defendant's motion to suppress should have been allowed, and his judgment of
conviction should be vacated.

      SHIN, J. (dissenting in part, with whom
Rubin, Massing, Henry, Desmond, Sacks, D'Angelo, Smyth, Toone, Tan, and Wood,
JJ., join).  I join Justice Massing's
dissenting opinion in full.  I write
separately to underscore that the problem here lies not with the officers who
made the stop but with the prosecution's failure, in response to the
defendant's motion to suppress, to substantiate the basis of Sergeant Shannon
O'Donnell's information that the defendant was the suspected robber, which was
the underpinning of the stop.  Thus, the
notion that it would have been "poor police work" for the officers
not to investigate the defendant based on O'Donnell's report only serves to
obscure the real issue in the case.
      It is settled law that officers may
conduct a stop based on information possessed by another officer so long as
their reliance on that information is objectively reasonable.  See United States v. Hensley, 469 U.S. 221,
232-233 (1985); Commonwealth v. Privette, 491 Mass. 501, 508-509 (2023).  "Variously called the 'collective
knowledge' or 'fellow officer' rule, this doctrine recognizes the practical
reality that 'effective law enforcement cannot be conducted unless police
officers can act on directions and information transmitted by one officer to
another.'"  United States v. Lyons,
687 F.3d 754, 766 (6th Cir. 2012), quoting Hensley, supra at 231.  In this case I accept that it was objectively
reasonable for Detective Allison Eng and the other seizing officers to credit
the information provided by O'Donnell that the defendant was the robbery
suspect.  I therefore further accept that
the seizing officers were entitled to rely on that information in making the stop.
      It is equally settled law, however, that
once a defendant is then charged and moves to suppress evidence obtained from
the stop, the government must prove not just objectively reasonable reliance by
the seizing officers, but also that the information underlying the stop was
based on reasonable suspicion that the defendant committed a crime.  See Hensley, 469 U.S. at 232; Commonwealth v.
Cheek, 413 Mass. 492, 494-495 (1992). 
See also Lyons, 687 F.3d at 766 (principles governing collective
knowledge apply "[w]hether [information is] conveyed by police bulletin or
dispatch, direct communication or indirect communication").  This rule does not hinder the officers'
ability to make the stop but, once the matter is in court, puts the burden on
the prosecution to "substantiate the basis of the [underlying]
information" when faced with a motion to suppress.  United States v. Alvarez, 40 F.4th 339, 352
(5th Cir. 2022).  Were the rule
otherwise, it "could enable an officer to 'bring about a lawful stop by
the simple expedient of passing [information] on to another
officer.'"  Jenkins v. United
States, 152 A.3d 585, 590 (D.C. 2017), quoting 4 W.R. LeFave, Search and
Seizure § 9.5(j) (5th ed. 2012).  To
illustrate, had O'Donnell made the stop herself, the Commonwealth would of
course need to prove she had reasonable suspicion that the defendant was the
suspect she saw in the video footage from eleven and twelve days earlier and
could not rely merely on her say-so that the "guy" came
"back."  That O'Donnell instead
communicated her suspicion to another officer does not lower the Commonwealth's
burden.  See Commonwealth v. Keene, 89
Mass. App. Ct. 902, 903-904 (2016) (although Boston police stopped defendant in
reasonable reliance on radio report from Stoughton police describing car
occupied by armed and dangerous suspects, stop violated Fourth Amendment
because Stoughton police lacked reasonable suspicion that defendant or other
occupant committed shooting).
      At the suppression hearing, the
Commonwealth offered three pieces of evidence relevant to O'Donnell's suspicion
that the defendant was the robber: 
(1) the January 2 video footage, which showed the suspect
wearing a mask, a coat and shoes with distinct markings, and a black and white
checkered hat; (2) a screenshot from the January 3 video footage (but
not the video itself), which showed an unmasked man wearing a similar coat and
shoes but a different hat; and (3) a screenshot from the January 14
video footage (but not the video itself), which showed the defendant in profile
-- his facial features and shoes not visible -- wearing a similar hat to the
one in the January 2 video footage, but a different coat.  None of this evidence adds to the information
already known to Eng, as she had watched the January 2 video footage and seen
the screenshots from January 3 and 14 before making the stop.  Consequently, there is no basis in the record
to conclude that O'Donnell had any additional knowledge supporting reasonable
suspicion that could be imputed to Eng or, alternatively, that could be pooled
with Eng's existing knowledge to meet the reasonable suspicion threshold.  See Privette, 491 Mass. at 514-515.  And indeed, the Commonwealth never even
raised such a claim, either to the judge or on appeal.
      Thus, in the end, this case comes down to
the question whether Eng herself had reasonable suspicion that the defendant
was the robber.  See Lyons, 687 F.3d at
766 ("if an investigating officer lacked sufficient information to satisfy
the reasonable suspicion requirement, and the [responding officer's] subsequent
observations did not produce reasonable suspicion, then the stop violates the
Fourth Amendment" [quotation and citation omitted]).  That question in turn comes down to whether
the Commonwealth proved that the defendant's hairstyle and the hat he was
wearing were distinctive enough to distinguish him from other dark-skinned men
in the neighborhood given the twelve-day lapse in time between the reported
robbery and the stop.  For the reasons
well stated by Justice Massing, the Commonwealth did not meet that burden, and
so the motion to suppress should have been allowed.

footnotes

[1] This case
initially was heard by a panel comprised of Justices Massing, Hershfang, and
Tan.  After circulation of a majority and
dissenting opinion to the other justices of the Appeals Court, the justices
decided to all participate in deciding the case after reviewing the briefs and
record and listening to the recording of the oral argument.  See G. L. c. 211A, § 11.  Justice Allen did not participate in the
deliberation on this case.

[2] Chief Justice
Blake and Justices Vuono, Rubin, Massing, Henry, Desmond, Sacks, Shin, Hand,
Grant, Walsh, Hershfang, Brennan, D'Angelo, Smyth, Toone, Tan, and Wood.

[3] Justices
Meade, Neyman, Ditkoff, Singh, Englander, and Hodgens.

[4] Chief Justice
Blake and Justices Vuono, Meade, Neyman, Ditkoff, Singh, Englander, Hand,
Grant, Walsh, Hershfang, Brennan, and Hodgens.

[5] All except
for Justice Ditkoff.

[6] Justices
Rubin, Massing, Henry, Desmond, Sacks, Shin, D'Angelo, Smyth, Toone, Tan, and
Wood.

[7] O'Donnell
"believed that he was involved in drug transactions"; for reasons
discussed below, this suspicion plays no role in our analysis.

[8] The Commonwealth
wisely did not argue that O'Donnell's observations of the defendant's purported
involvement in drug transactions, standing alone, provided reasonable suspicion
to stop the defendant.  "It is not
necessary in cases such as this that the police officer observe an exchange of
items or actually see drugs or cash, but it is necessary that the observations
by the police occur in a factual context that points to criminal
activity."  Commonwealth v. Kearse,
97 Mass. App. Ct. 297, 302 (2020).  The
Commonwealth's presentation at the suppression hearing was inadequate to
provide specific, articulable facts to justify stopping the defendant for
buying or selling drugs.  See
Commonwealth v. Lyons, 409 Mass. 16, 19 (1990).

[9] O'Donnell
also sent a text message to Eng on January 14 stating, "Your guy is
back" and attached a "still shot" of the suspect.  Although the still photograph did not show
the person's face, there was no dispute that the man depicted in that still
photograph and on the video feed from January 14 was the same person police
approached and ultimately arrested -- that is, the defendant.

footnotes for concurring

[1] Furthermore,
I concur because I agree with the majority that, even if the seizure occurred
at the moment that the police officers began running after the defendant, the
police had reasonable suspicion to stop the defendant at that point.

[2] Under the
Fourth Amendment to the United States Constitution, a seizure does not occur
until a person acquiesces to a show of authority or is physically seized.  California v. Hodari D., 499 U.S. 621,
624-626 (1991).  As the United States
Supreme Court explained, "[s]treet pursuits always place the public at
some risk, and compliance with police orders to stop should therefore be
encouraged."  Id. at 627.

[3] I acknowledge
that there are cases, issued before Matta and Franklin clarified the law, that
state that mere pursuit constitutes a seizure. 
See, e.g., Commonwealth v. Sykes, 449 Mass. 308, 314 (2007);
Commonwealth v. Webster, 75 Mass. App. Ct. 247, 253 (2009).

footnotes for dissenting

[1] The officers
referred to the apartment complex as the "Bromley Heath Projects" at
the suppression hearing, but it has been renamed for longtime tenant
organization executive director and civil rights activist Mildred C.
Hailey.  See Commonwealth v.
Karen K., 99 Mass. App. Ct. 216, 217 n.2 (2021), S.C., 491 Mass. 165
(2023).

[2] I have
reviewed the surveillance video footage and photographs in evidence.  The suspect appears to be a dark-skinned
Black man in some images, and he appears to be a medium- or light-skinned Black
man in others.  Indeed, I question
whether the suspect seen on January 2 is the same person seen on January 3 -‑
there is little resemblance, other than the jacket and sneakers, and the fact
that both men are Black.  The suspect was
wearing a different hat on January 3, as Eng acknowledged in her
testimony.  I concede, however, that the
motion judge's finding that the suspect in the video footage on January 2 was
"the same suspect" as the man in the video footage on January 3 is
not clearly erroneous.

[3] Moreover,
based on the evidence in the record, it is a mystery how Eng could discern the
defendant's hairstyle on January 14.  In
the screenshot that O'Donnell sent Eng that day, and in the body camera footage
of the pursuit and arrest, the defendant's hair is hidden by his hat and the
raised hood of his jacket.
      
[4] Eng testified
that "it's common for people to keep [the metallic tag] on the hat even
after they purchase it and wear it with the reflective logo on the brim of the
hat."  Only after the defendant was
arrested did the officers learn that the hat had the logo of the Brooklyn Nets
basketball team.

[5] I join in
part 1 of the majority's opinion. 
Speaking for myself and some, but not all, of the Justices joining in
this dissent, I would go further and hold that the approach from one direction
of three plainclothes detectives, recognizable as such, with four uniformed
officers approaching from the other direction, and with a police wagon visibly
parked in the middle of the parking lot, was a sufficient show of force to
amount to a stop.  Considering the
approach of the seven officers to be the seizure, the defendant's flight should
not be considered at all.  In any event,
his flight adds nothing significant to the reasonable suspicion calculus.